UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-10304-GAO |
| | ) | |
| PABLO BAEZ | ) | |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
TO SUPPRESS INFORMATION AND EVIDENCE DERIVED FROM
STATE AND FEDERAL WIRETAPS AND FOR A *FRANKS* HEARING

Defendant, Pablo Baez, submits this memorandum of law in support of his motion to

suppress the fruits of court-authorized electronic surveillance based on affidavits that contained

material misstatements and omitted material information in violation of N.Y. Crim. Proc. Law §§

700.15(4) and 700.20(2)(d), and 18 U.S.C. § 2518(1)(c), and in support of his request for a

hearing under Franks v. Delaware ("Franks"), 438 U.S. 154 (1978).

Mr. Baez is charged in Count Three of the sixteen-defendant Superseding Indictment

with a conspiracy to distribute heroin and cocaine "at least by in or about March of 2005, and

continuing to on or about November 30, 2005."  During most of this period, however, Mr. Baez

was an informant for the DEA.  Despite the fact that Mr. Baez was cooperating and providing

useful information to DEA, law enforcement sought judicial authorization for a New York state

wiretap, and later a series of Title III interception orders out of Boston.  In doing so, the law

enforcement agents knowingly misled the Court about the necessity of a wiretap and the extent

to which they had tried to use traditional investigative techniques; and they failed to disclose the

extent to which Mr. Baez could have provided information to law enforcement, rendering a

wiretap unnecessary.  Given the obvious and deliberate misstatements and omissions from the

affidavits submitted in support of the wiretap authorizations, the fruits of the wiretaps must be

suppressed.  At a minimum, the Court must conduct an evidentiary hearing to determine the scope of the government's false statements and material omissions in its submissions for the wiretaps.

Factual Background[1]

Mr. Baez began providing information to the DEA in New York in December 2004.[2] Specifically, in December 2004, Mr. Baez called DEA Special Agent Sean Canavan ("SA Canavan") with "information related to other individuals in New York trafficking in drugs." Tr. at 6.  Although Mr. Baez was not yet signed up as a cooperating source ("CS") with the DEA, Mr. Baez and SA Canavan met in person or spoke approximately five to ten times from January 2005 to February 2005.  Tr. at 25-26.  After doing some research, SA Canavan and his partners found that Mr. Baez "was right on target with a lot of information."  Tr. at 8.

In mid-May 2005, Mr. Baez provided information to SA Canavan about Luis Lopez.  Tr. at 9.  Mr. Baez told SA Canavan that he (Mr. Baez) was driving a taxi and came into contact with an associate of Mr. Lopez, who was supposed to make a cash delivery, but became nervous when he spotted surveillance behind him.  Mr. Baez then drove this individual from New York to Boston, and came into contact with Mr. Lopez.  Tr. at 12.

---

[1]    In this memorandum, Mr. Baez relies on, among other things, the transcript of his detention hearing and a series of DEA-6 reports of his contacts with law enforcement.  For purposes of this motion, relevant sections of the transcript of the main portion of the detention hearing, which was held on January 12, 2006, are attached to the Affidavit of Peter B. Krupp ("Krupp Aff.") at Exhibit 1 and cited herein as "Tr. at [page]."  Relevant sections of the transcript of the second day of the detention hearing, which was held on January 17, 2006, are attached to Krupp Aff. at Exhibit 2 and cited herein as "Tr. 2 at [page]."  The DEA-6 reports are attached to Krupp Aff. at Exhibit 3 and organized therein in chronological order.  They are cited herein as "DEA-6 at [page] [(date of the DEA-6)]."

[2]    Mr. Baez had also cooperated with DEA in 1989 and 1995.  Tr. at 6; Tr. 2 at I-3.

2

On June 8, 2005, Mr. Baez formally signed papers to become a confidential source for DEA. Tr. at 9. SA Canavan and Special Agent Jack Daly met with Mr. Baez at DEA's New York Field Division office. DEA-6 at 1 (6/6/05). During that meeting, Mr. Baez signed a Confidential Source Agreement ("CSA") Form DEA-473, and a Form DEA-473a, the Spanish language version of the CSA. Tr. at 9-10.

The CSA, a copy of which is attached to Krupp Aff. at Exhibit 4, expressly authorized Mr. Baez to perform activities that otherwise would be unlawful. Under the CSA, Mr. Baez and his DEA handlers acknowledged that Mr Baez "ha[s] been requested by the Drug Enforcement Administration ("DEA") to provide assistance in the investigation of violations of the Controlled Substances Act." The CSA then "authorized" Mr. Baez, "while under the direct supervision or control of DEA controlling Investigators, to perform activities that include the following:"

1.    The controlled purchase of controlled substances in an undercover capacity under the direction and control of DEA Controlling Investigators.

2.    The introduction of an undercover agent to a violator.

3.    The infiltration of a drug trafficking organization.

4.    To pose as a person engaged in the illicit sale or distribution of controlled substances.

5.    To assist in the controlled delivery of controlled substances to a violator.

6.    The consensual wearing of a recording or transmitting device in furtherance of these activities.

7.    The taping of telephone conversations between myself and drug violators in furtherance of these activities.

CSA at 1. The controlling agents completed the CSA form by hand to specify that "this agreement is in force from *June 8, 2005* until *June 8, 2006*." Id. at 2 (handwritten portion of the

CSA shown in italics). <u>See</u> <u>also</u> <u>Tr</u>. at 68.  Nothing in the CSA required Mr. Baez to report to

SA Canavan or any other DEA agent with any specified regularity.  <u>CSA</u> at 1-2; <u>Tr</u>. at 67.

At the meeting on June 8, 2005, Mr. Baez also provided SA Canavan with information

about a "multi-kilogram heroin dealer who [was] originally from Florida."  Mr. Baez "referred to

this person as Luis Lopez" but stated "that this [was] not his real name."  Mr. Baez stated that

"Lopez [was] from the Dominican Republic, but has official paperwork which states that he

(Lopez) is from Puerto Rico."  Mr. Baez provided a detailed physical description of Lopez.  Mr.

Baez also told SA Canavan that Lopez had a "heroin enterprise which is located in Florida,

Baltimore, MD, New York, NY and Boston, MA" and that "Lopez is selling the kilograms of

heroin at $60,000.00 USC each."  <u>DEA-6</u> at 1 (6/8/05).

A week later, on June 15, 2005, Mr. Baez met with SA Canavan and SA Art Guedes in

the Bronx, New York.  <u>Tr</u>. at 13.  At the meeting, Mr. Baez provided SA Canavan with a

telephone number for Lopez.  <u>Tr</u>. at 11, 29.  Mr. Baez explained that Lopez had two different

phones, but that Mr. Baez only had the 407 number.  <u>Tr</u>. at 13.  SA Canavan paid Mr. Baez $500

for this information.  <u>Tr</u>. at 13.

On June 16, 2005, SA Canavan prepared a report with additional information provided by

Mr. Baez about Lopez.  The report stated:

> The CS [Mr. Baez] has been traveling with LOPEZ for several
> weeks.  The CS has occasionally been with LOPEZ when he has
> met his east coast Heroin distributors.  The CS has spoken with
> LOPEZ almost every day via cellular telephone or face to face.
> LOPEZ provided the CS with cellular telephone contact number
> (407) 739-8405.  LOPEZ spoke freely of his drug enterprise.
> LOPEZ stated that approximately 80 kilograms of heroin are
> coming from Florida via a moving company.

DEA-6 at 1 (6/16/05).  The report identified Lopez and Luis Cruz-Pinero, among others, as targets of the investigation and provided identifying information for both Lopez and Cruz-Pinero.  Id. at 1-2.

SA Canavan also testified that on one occasion, Mr. Baez called to tell him that he (Mr. Baez) had physical possession of Lopez's telephone because he (Mr. Baez) was holding it for Lopez.  At SA Canavan's request, Mr. Baez met SA Canavan at one of their usual meeting locations, the corner of 155th Street and Broadway in Bronx, New York, and gave the telephone to SA Canavan.  SA Canavan kept the phone overnight and "took all the phone numbers down . . . that were in his, his telephone book within the phone."  Tr. at 34-35.

With the information provided by Mr. Baez on June 15, SA Canavan "subpoenaed the records for subscriber as well as tolls" for Lopez's telephone number.  Tr. at 12.  On June 22, 2005, only two weeks after Mr. Baez had been officially signed up as a DEA CS, SA Canavan applied for and obtained a wiretap from a New York state court for Lopez' telephone number.  Tr. at 12-13.  In his Affidavit in Support of an Application for an Eavesdropping Warrant, dated June 22, 2005, filed in the Supreme Court of the State of New York and attached to Krupp Aff. at Exhibit 5 ("Canavan Aff."), SA Canavan represented that:

- CI-1 [Mr. Baez] has provided credible information to the DEA in the past.  In addition we have been able to corroborate much of CI-1's information about LUIS A. LOPEZ. (¶ 12);

- Within the past two weeks, LUIS A. LOPEZ has spoken to CI-1 about the imminent receipt of multiple kilograms of heroin in New York City.  CI-1 has also been present when LUIS A. LOPEZ has discussed the sale and distribution of a portion of that heroin (¶ 13);

- LUIS A. LOPEZ has used TARGET CELLPHONE 1 on multiple occasions to call CI-1 about setting up times to

meet in order to further his narcotics business, <u>Canavan Aff</u>. ¶ 13;

- We know from CI-1 that LUIS A. LOPEZ has dual residences in New York County and Florida, but that he is currently staying in New York City in anticipation of the receipt of the heroin shipment, <u>Canavan Aff</u>. ¶ 15;

- In addition, members of the DEA have conducted surveillance of meetings between LUIS A. LOPEZ and CI-1, <u>Canavan Aff</u>. ¶ 15; and

- CI-1 . . . [has] met some of LUIS A. LOPEZ'S workers and associates in the narcotics business. CI-1 . . . [has] also supplied some information pertaining to the methods used by LUIS A. LOPEZ to receive heroin, <u>Canavan Aff</u>. ¶ 20.

Although Mr. Baez had just been signed up as a CS only two weeks earlier, SA Canavan represented that the use of "principal investigative techniques employed in this investigation thus far" and the information provided to the DEA by Mr. Baez "will not allow us to achieve the goals of this investigation."

Towards the end of June 2005, Mr. Baez provided the DEA with information about money being paid to individuals in connection with a shipment of heroin going to New York. <u>Tr</u>. at 14-15. On June 29, 2005, Lopez contacted Mr. Baez regarding a pending heroin delivery. According to a DEA report of expenditure of trafficker directed funds on June 29 and 30, 2005, Mr. Baez told DEA that "the Lopez organization is currently arranging the delivery of eighty kilograms of heroin from Florida to New York." <u>DEA-6</u> at 1 (7/5/05) (hereinafter "<u>Expenditure Report</u>"). On the same day, Mr. Baez received $3,000 from a member of the Lopez organization. <u>Id</u>. at 1; <u>Tr</u>. at 15. Mr. Baez was instructed by Lopez to transfer the $3,000 and a furniture list to two female organization members in Queens, New York who were responsible for the chemical extraction of the heroin from furniture. <u>DEA-6</u> at 1 (6/29/05); <u>Expenditure</u>

Report at 1; Tr. at 15, 53.  Mr. Baez called SA Canavan to report that he had the money, Tr. at

53, met with DEA agents on June 29 to prepare for the meeting, and provided DEA with the

furniture list which was copied.  DEA-6 at 1-2 (6/29/05).  Relying on the information provided

by Mr. Baez, SA Canavan and other DEA agents were able to conduct surveillance of the

transaction and follow the two unknown females after the money was transferred. Id. at 1-2; Tr.

at 15.

On June 30, 2005, Mr. Baez provided the DEA with information regarding a transaction

for $10,000.  Tr. at 15-16.  Lopez instructed Mr. Baez to meet an unknown female at the San

Antonio-Botanica in Bronx, New York.  According to a DEA surveillance report, when Mr. Baez

arrived at the San-Antonio Botanica, the unidentified female gave him approximately $10,000.

DEA-6 at 1 (7/5/05) (hereinafter "Surveillance Report"); Expenditure Report at 1; Tr. at 16.  SA

Canavan believed that the money "was to pay for the transportation to bring the furniture from

Florida to New York."  Tr. at 15-16.  See Expenditure Report at 1.  Again, once Mr. Baez

received the money, he contacted SA Canavan and told him that he (Mr. Baez) was supposed to

deliver it for Lopez.  Tr. at 55.

In connection with the delivery, Mr. Baez provided DEA with a general description of a

Hispanic male that he was to meet in a McDonald's parking lot in the Bronx and the agents

established surveillance of the location.  Surveillance Report at 1.  In the course of the

surveillance, DEA agents observed Mr. Baez meet with three Hispanic males and watched one of

them walk to Mr. Baez's vehicle and pick up an envelope containing the money.  The agents

were able to obtain license and registration information for the vehicle in which the three men

were traveling.  Id. at 2.  SA Canavan testified that Mr. Baez was authorized to conduct both the

$3,000 and $10,000 transactions.  Tr. at 15-16.

On July 6, 2005, SA Al Gyenes debriefed Mr. Baez regarding Lopez' heroin trafficking activities in New York. <u>DEA-6</u> at 1 (7/6/05). The debriefing report provides that:

> The CS [Mr. Baez] met with LOPEZ during the afternoon hours of 7-6-05 in Queens, NY. The CS explained that immediately after the met [sic] with LOPEZ, LOPEZ was scheduled to meet with Maritza LNU and Sonia LNU . . . to discuss LOPEZ receiving an unknown quantity of heroin in the future. The CS stated that the heroin will be concealed with in [sic] wooden furniture and stored in an unknown location in Queens, New York. The CS is scheduled to meet with LOPEZ on 7-7-05, to discuss additional details pertaining to the heroin.

<u>Id</u>. at 1. The report also contains identifying information for "Maritza" and "Sonia." <u>Id</u>. at 2.[3]

SA Canavan also testified that, with Mr. Baez's agreement, DEA installed audio, video and GPS surveillance equipment in Mr. Baez's vehicle in June or July 2005. <u>Tr</u>. at 41-42. SA Canavan believed the equipment was located in the steering wheel and that Mr. Baez was shown how to operate it. <u>Tr</u>. at 41. (The equipment was not removed from Mr. Baez's vehicle until after his arrest. <u>Tr</u>. at 42.)

On August 5, 2005, SA Canavan and SA Guedes again met with and debriefed Mr. Baez who reported that:

> Luis LOPEZ is currently in Boston, MA attempting to obtain money to pay off a past heroin debt owed to FNU LNU (A.K.A. Caliche) in Colombia. . . . When LOPEZ has the money for the past drug debt owed to Caliche, LOPEZ is supposed to call an unknown Colombian male (U/M) at 617-747-3478 . . . [who] is the cousin of Jota LNU who works directly for Caliche.

<u>DEA-6</u> at 1 (8/5/05). Mr. Baez also provided the name, address and telephone number for Lopez' business in Florida and stated that Lopez was "attempting to sell a building in Garden Hills, Santiago for 12 million dollars." <u>Id</u>. at 1-2.

---

[3]    No DEA-6 for the July 7, 2005 meeting has been produced by the government.

On August 26, 2005, Mr. Baez was allowed to listen to approximately 40 seconds of a recorded telephone conversation provided by SA Belleau in Bogotá and identified Maritza Pelaez-Jimenez as the voice on the recording.  DEA-6 at 1 (8/29/05); Tr. at 61.

DEA agents met again with Mr. Baez on August 31, 2005.  Mr. Baez had been told by members of Lopez's family that he was currently in the Dominican Republic attempting to obtain money to pay Caliche for a past heroin debt.  Mr. Baez provided details about Lopez' travel plans, stating that "Lopez will travel from the DR through Haiti and land in NY, in the very near future" and was "traveling through Haiti to visit 'Witch Doctors' who will try to guarantee Lopez's safe return to the US without being arrested by law enforcement or killed by rival narcotics organizations."  DEA-6 at 1 (8/31/05).

At the August 31 debriefing, Mr. Baez provided further information about members of Lopez' narcotics organization.  Mr. Baez stated that Alejandro, Pelaez-Jimenez's husband and brother of Jota, was currently in jail in Florida for a federal narcotics violation, and that "Jota organizes and ships hundreds of kilograms of heroin to the United States."  DEA-6 at 1 (8/31/05).

SA Gyenes and SA Christopher Balchon again met with Mr. Baez on September 12, 2005.  Mr. Baez had met with Lopez in the Bronx and reported that Lopez was currently residing in the Boston area.  Mr. Baez stated that "Lopez is going to receive approximately (four) 4 kilograms of heroin from 'Alex,'" but did not know if the heroin was coming to Boston or the New York City area.  DEA-6 at 1 (9/17/05); Tr. at 62-63.  Mr. Baez described Alex as "a Colombian male who resides in Queens, NY" and "an associate of Maritza Pelaez-Jimenez." Mr. Baez stated that Pelaez-Jimenez was currently in Miami, Florida, but that she traveled from Miami to Queens.  DEA-6 at 1 (9/17/05).

9

On September 23, 2005, Mr. Baez recorded a meeting he had with Mr. Lopez in New York.  At approximately 6 p.m., SA Balchon, SA Canavan and SA Gyenes met with Mr. Baez and provided him with a recorder.  They observed Mr. Baez drive to the area of the Maybar Café in the Bronx, enter the restaurant and meet with Lopez.  DEA-6 at 1 (9/26/05); Tr. at 64.  Mr. Baez returned the recording device to the DEA that same day.  Tr. at 64.  The recorded conversation related to Mr. Lopez' drug activities.  Tr. at 65.  Mr. Baez never indicated that he was unwilling at any time in the future to wear a wire or recording device in meetings with Lopez.  Tr. at 65.

On September 29, 2005, SA Jean Drouin for the DEA filed an Affidavit in Support of Authorization to Intercept Wire Communications ("Drouin Aff.") in the United States District Court for the District of Massachusetts in support of an application for an order authorizing the interception of the wire communications to and from the cellular telephone number 617-642-3867 used by Julio Cartegena.  Drouin Aff. ¶ 10.  Relevant portions of the Drouin Affidavit are attached to Krupp Aff. at Exhibit 6.  In his affidavit, SA Drouin stated that:

> Normal investigative techniques have been employed and have met with limited success and appear unlikely to be more successful if continued.  Additional techniques normally employed to collect evidence of the above listed offenses appear reasonably unlikely to succeed if they are tried or are too dangerous to employ.

Id. ¶ 17.  SA Drouin noted that during the investigation, DEA agents had gathered information from confidential sources, surveillance, and analysis of phone records and pen register data.  He claimed that:

> These traditional law enforcement investigative techniques have failed to identify the location to where CARTAGENA and LOPEZ have been smuggling heroin, the exact method which they import heroin and cocaine into the United States, the persons to whom CARTAGENA supplies heroin and cocaine, the method in which

> the organization launders drug proceeds, or the full nature and
> scope of his drug trafficking activities.

Id. ¶ 66.  He further stated that "none of the confidential sources of information are in a position to reveal the full nature and scope of CARTAGENA's drug trafficking activities."  Id. ¶ 66.  SA Drouin further stated that, in his belief, "the interception of wire communications is the only available technique which has a reasonable likelihood of revealing, and securing, admissible evidence needed to establish the full scope and nature of the offenses being investigated."  Id. ¶ 65.

Based on the Drouin Affidavit, now-Chief Judge Mark L. Wolf entered an order on September 29, 2006 authorizing the interception.  The interception began on September 29, 2005 and continued until October 14, 2005 (the "Federal Wiretap").  See Affidavit of Jean Drouin in Support of Probable Cause Hearing and Detention, dated December 15, 2005, par. 14, the relevant section of which is attached to Krupp Aff. at Exhibit 7.

In October 2005, Mr. Baez provided SA Canavan with additional information regarding an individual named Alex, a Columbian male and an associate of Lopez.  Mr. Baez provided an address in Queens, New York, which SA Canavan was able to verify.  Tr. at 17, 39.  Mr. Baez called SA Canavan on October 6, 2005 to report that he had to meet with Alex for Lopez later that day.  Tr. at 37-38.  With information provided by Mr. Baez, SA Canavan was able to take a surveillance photo of Alex in the vicinity of Alex's house as he was leaving Mr. Baez's vehicle. Id.

Later that day, SA Canavan and SA Guedes met with Mr. Baez to debrief him about his meeting with Alex.  Mr. Baez told DEA that Lopez had provided him (Mr. Baez) with $1,500, and directed Mr. Baez to provide it to Alex who was to wire $1,000 to Lopez' wife in the

Dominican Republic. The remaining $500 was for Mr. Baez to use towards maintenance of his vehicle. <u>DEA-6</u> at 1 (10/12/05). Mr. Baez later gave SA Canavan the Western Union receipts for the wire transfer. <u>Tr</u>. at 33.

 On October 11, 2005, Mr. Baez called SA Canavan to provide information he had heard from Lopez about a shipment of heroin coming to the United States that was seized in Cartagena, Columbia. According to SA Canavan, "[Mr. Baez] said that the shipment, there was a shipment supposedly coming to the United States and that it got detained in Columbia, Cartagena, Columbia and that it got stopped. I think he believed it was approximately 10 keys of heroin, kilograms of heroin." <u>DEA-6</u> at 1 (10/18/05); <u>Tr</u>. at 17-18. <u>See also</u>, <u>Tr</u>. at 66. Mr. Baez informed SA Canavan that Lopez, who was currently residing in the Boston area, "was going to receive approximately 10 kilograms of heroin from 'Jota' . . . a Colombian male who resides in Colombia." <u>DEA-6</u> at 1 (10/18/05). "Mr. Lopez was paying approximately $52,000 USC for each kilogram of heroin." <u>Id</u>. at 2.

 On the same day, SA Canavan confirmed with SA Belleau in Bogotá that approximately 10 kilograms of heroin had been seized in Cartagena during the weekend of October 8- 9, ostensibly because the paperwork for the shipment was not in proper order. The shipment of 16 kilograms of heroin was hidden within large, thick glassed pictures and was destined for Florida. According to SA Belleau, the names on the manifest were Sandra Ximena Pelaez-Ayala and Ruberio Gomez, address 6900 Southgate Blvd. Apt 111, Tamarac, Florida. <u>DEA-6</u> at 1-2 (10/18/05).

 SA Canavan testified that the conversation on October 11, 2005 was the last time he was in contact with Mr. Baez. <u>Tr</u>. at 19-20. On November 16, 2005, SA Canavan unilaterally deactivated Mr. Baez as a DEA CS because he claimed that he had been "unable to contact the

CS since early October 2005." <u>DEA-6</u> at 1 (11/16/05). SA Canavan never informed Mr. Baez

that he was no longer signed up as a CS with DEA, nor did he notify Mr. Baez that he was no

longer authorized to engage in the conduct expressly permitted under the CSA. <u>Tr.</u> at 44.


ARGUMENT

I.    THE COURT SHOULD SUPPRESS THE FRUITS OF THE NEW YORK
      <u>STATE AND BOSTON FEDERAL WIRETAPS.</u>

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510,

*et seq*. (1982 and 1986 amendments), which controls the interception of wire and electronic

communications, requires that each application for an order authorizing the interception of a

wire, oral or electronic communication shall include, among other requirements, "a full and

complete statement as to whether or not other investigative procedures have been tried and failed

or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18

U.S.C. § 2518(1)(c). An order authorizing a wiretap requires a similar finding by the judge that

"normal investigative procedures have been tried and have failed or reasonably appear to be

unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

The requirements of N.Y. Crim. Pro. Law §§ 700.15(4) and 700.20(2)(d),[4] which govern

issuance of warrants for electronic surveillance in New York state, are virtually identical to those

set forth in the federal statute and have been interpreted consistently with the federal law by New

---

[4]    Section 700.15 states, in relevant part, that "[a]n eavesdropping or video surveillance warrant may issue only . . . (4) [u]pon a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ." Section 700.20(2) requires that the application of state wiretap "must contain: . . . (d) a full and complete statement of facts establishing that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ, to obtain the evidence sought."

13

York and federal courts.  See, e.g., United States v. Lilla, 699 F.2d 99, 102 (2d Cir. 1983).  New

York's highest court has held that the New York statute was designed to harmonize "state

standards for court authorized eavesdropping warrants with federal standards."  Id., citing People

v. McGrath, 46 N.Y.2d 12, 26-27 (1978).

Under both federal or New York state law, these statutory provisions establish the so-

called "necessity" requirement for granting a wiretap order.  United States v. Ippolito, 774 F.2d

1482, 1485 (9th Cir. 1985); People v. Fonville, 247 A.D.2d 115, 118 (N.Y. App. Div. 1998).

The "necessity" requirement of 18 U.S.C. § 2518(1)(c) -- and the corresponding provision in

N.Y. Crim. Proc. Law § 700.20(2)(d) -- is a matter of constitutional law and is rooted in the

Fourth Amendment requirement that searches be reasonable and that the courts authorize no

greater invasion of privacy than necessary under the circumstances.  United States v. Salemme,

978 F. Supp. 343, 349 (D. Mass. 1997); People v. Fonville, 247 A.D.2d at 118-19.  It is

"designed to assure that wiretapping is not resorted to in situations where traditional

investigative techniques would suffice to expose the crime."  United States v. Kahn, 415 U.S.

143, 153 n.12 (1974).

A wiretap is a serious invasion of privacy and individual liberty.  People v. Viscomi, 113

A.D.2d 76, 76 (N.Y. App. Div. 1985).  Therefore, wiretaps should be used only if necessary.

United States v. Cole, 807 F.2d 262, 267 (1st Cir. 1986).   Electronic surveillance is to be used

with restraint; not routinely employed as the initial first step in a criminal investigation.  United

States v. Lilla, 699 F.2d at 102, citing United States v. Giordano, 416 U.S. 505, 515 (1974);

People v. Fonville, 247 A.D.2d at 119.  Although use of a wiretap may at times be more

efficient, the statutory requirement that law enforcement exhaust other investigative procedures

before seeking use of a wiretap reflects a congressional judgment that the cost of such efficiency

in terms of privacy interests is too high.  United States v. Lilla, 699 F.2d at 105 n. 7.  "[I]n a

society that values privacy and the rights of individuals, wiretapping is to be distinctly the

exception-not the rule."  United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987).

"[T]he constitutionality of Title III relies in meaningful measure on the process it provides for an

independent judicial officer, rather than a law enforcement officer engaged in the competitive

business of fighting crime, to decide that electronic surveillance is necessary, and therefore

reasonable, in a particular case." United States v. Salemme, 978 F. Supp. at 348-49.

         Both the applicable statutes and the cases interpreting them recognize that the order

authorizing an interception of electronic communications must be based on a "full and complete

statement."  18 U.S.C. § 2518(1)(c); N.Y. Crim. Proc. Law § 700.20(2)(d).  "The government's

statutory obligation to make a 'full and complete statement' concerning the necessity of the

powerful but intrusive weapon that electronic surveillance constitutes is unqualified; the

government is obligated to inform the court of *all* of its information on this issue."  United States

v. Salemme, 978 F. Supp. at 348.

         As with a search warrant affidavit, those applying for a wiretap may not deliberately omit

information that, if known to the issuing judge, would prevent a finding of necessity.  United

States v. Yeje-Cabrera, 430 F.3d 1, 4 (1st Cir. 2005); People v. Fonville, 247 A.D.2d at 120.

Constitutional standards concerning suppression, including the standards established by the

Supreme Court in Franks, apply to alleged violations of both the federal and New York statutes.

See United States v. Ippolito, 774 F.2d at 1485; United States v. Salemme, 978 F. Supp. at 349;

People v. Fonville, 247 A.D.2d at 120.  Applications under the federal or New York statute

which are found to be incomplete or materially misleading regarding the necessity for electronic

surveillance may result in the suppression of the intercepted communications and the evidence

derived therefrom.  United States v. Salemme, 978 F. Supp. at 348; People v. Fonville, 247

A.D.2d at 116-117; People v .Candella, 171 A.D.2d at 333.  Where, as here, the government has

omitted material information that would have prevented a finding of necessity, the defendant

may move to suppress and seek a hearing under Franks.  United States v. Yeje-Cabrera, 430 F.3d

at 4.

      Under Franks, a defendant may challenge the constitutionality of a judicial order issued

in reliance on a police affidavit, if he shows that (1) "a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant

affidavit," and (2) that, "with the affidavit's false material set to one side, the affidavit's

remaining content is insufficient to establish probable cause."  438 U.S. at 155-56.  Franks

applies to omissions as well as affirmative misrepresentations.  United States v. Salemme, 978 F.

Supp. at 349; People v. Fonville, 247 A.D.2d at 120.  If the court would not have issued the

warrant had the omitted information been included in the affidavit, the information is material

and the wiretaps and all the information deriving therefrom must be suppressed.  United States v.

Cole, 807 F.2d at 268.  See also 18 U.S.C. § 2518(10)(a) (providing for suppression of evidence

derived from an unlawful interception).

      A.     The Fruits Of The New York State Wiretap Order Should Be
              Suppressed Because The Affidavit By SA Canavan Omitted
              Material Information Which, If Included in the Affidavit, Would
              Have Barred a Finding of Necessity.

         1.     This Court Has Jurisdiction to Assess the Validity of the
                 New York Wiretap Order.

      This Court has jurisdiction to hear a challenge to, and to suppress the fruits of, the New

York State eavesdropping order pursuant to state and federal standards.  Federal law governs

admissibility of wiretap evidence in federal prosecutions.  United States v. Charles, 213 F.3d 10,

19-20 (1st Cir.), cert. denied, 531 U.S. 915 (2000); United States v. Sutherland, 929 F.2d 765,

771 (1st Cir.), cert. denied, 502 U.S. 822 (1991).  This is true even when evidence is obtained

pursuant to a state search warrant.  United States v. Mitro, 880 F.2d 1480, 1485 n. 7 (1st Cir.

1989).  With regard to state authorized wiretaps, federal law expressly requires compliance with

federal standards:

> The principal prosecuting attorney of any State, or the principal
> prosecuting attorney of any political subdivision thereof, if such
> attorney is authorized . . . to make application to a State court
> judge . . . may apply to such judge for, and such judge may grant in
> conformity with section 2518 of this chapter and with the
> applicable State statute an order authorizing, or approving the
> interception of wire, oral or electronic communications.

18 U.S.C. § 2516(2) (emphasis added).  Title III thus itself requires that state authorized wiretap

orders be sought and granted in conformity not only with the applicable state statute, but with

Title III itself.

  Here, as described above, the New York statute substantially tracks the federal statute;

and the New York courts have interpreted the New York statute consistently with federal law.

See, supra, United States v. Lilla, 699 F.2d at 102.  Accordingly, pursuant to 18 U.S.C. §

2516(2), admissibility of the New York wiretap evidence depends upon the wiretap application

and order having met the standards set out in Title III and adopted by the State of New York.

Both the state and federal wiretaps, which were used in this case, must satisfy the same

constitutional and statutory requirements.

2.    The Affidavit By SA Canavan Submitted in Support of the
New York State Wiretap Authorization Contained Material
False Statements And Omitted Material Information
Which, If Corrected Or Included in the Affidavit, Would
Have Barred a Finding of Necessity.

The fruits of the New York wiretap on Lopez' telephone should be suppressed. In disregard for New York's statutory requirement of necessity, law enforcement officials in New York requested the wiretap before making a reasonable effort to pursue normal investigative procedures. Not only did the Canavan Affidavit omit the inconvenient fact that Mr. Baez had been signed up as an official CS for the DEA only two weeks before the affidavit was presented to the New York Supreme Court, but it made no mention of the scope of activities permitted to Mr. Baez under the CSA. Given how recently Mr. Baez had begun to assist the DEA in New York and the extent of the activities he was permitted to engage in, it was unreasonable and an affirmative misrepresentation for SA Canavan to suggest that normal investigative procedures had been tried, much less had failed.

In his affidavit, SA Canavan stated that Mr. Baez had provided credible information to the DEA in the past, much of which had been corroborated. Canavan Aff. ¶ 12. For example, Mr. Baez had already provided information regarding the shipment of heroin, had been privy to discussions regarding sale and distribution of that heroin, and had been contacted on "multiple occasions" by Mr. Lopez to set up meeting times to further Mr. Lopez's narcotics business. SA Canavan went on to make the blanket assertion, however, that the information from Baez was "limited" and would not "enable us to achieve the goals of this investigation." SA Canavan then recited a list of details Mr. Baez was unlikely to be able to supply.

What SA Canavan failed to mention in his Affidavit submitted on June 22, and obscured by stating that Mr. Baez "was currently working for the DEA", was that although Mr. Baez had

been providing information to the DEA since December 2004, he had only met Lopez in mid-May and had begun providing information specifically about him to the DEA thereafter, just over a month before SA Canavan applied for the wiretap. Furthermore, Mr. Baez had only become an official CS for the DEA two weeks earlier. The difference in his status before and after signing the CSA is significant. Upon signing the CSA, Mr. Baez was authorized to engage in a far broader array of activities designed to infiltrate the drug organization than he had been previously. Only after signing the CSA was Mr. Baez authorized, for example, to infiltrate a drug organization, pose as a person engaged in the illicit sale or distribution of controlled substances, and wear a recording or transmitting device. The DEA had allowed him only two weeks to engage in this expanded scope of activity before requesting the wiretap. Unless the expectation was for instantaneous results, the amount of time between signing Mr. Baez as a CS and submitting the affidavit was insufficient for Mr. Baez to infiltrate Lopez' operation in any meaningful way.

Given the amount of information that Mr. Baez was able to retrieve in such a short time, it appears that his contact with Lopez had virtually untapped potential and that he had demonstrated his ability to infiltrate the organization. Although SA Canavan claimed that if Mr. Baez were to ask too many questions, Lopez would become suspicious, there is nothing on the record to support that assertion. Lopez was clearly not suspicious of Mr. Baez, considering he had only known him for little more than a month. He spoke with Mr. Baez "freely of his drug enterprise," he introduced Mr. Baez to his distributors, traveled with Mr. Baez for several weeks, and entrusted him with significant mounts of cash. None of this conduct suggests an individual suspicious of another.

The facts in this case are similar to those in People v. Fonville, supra, which also involved the lawfulness of electronic surveillance in the context of drug offenses.  In Fonville, the court suppressed evidence resulting from a wiretap where the warrant application contained material falsehoods and omissions relating to the issue of necessity.  The court found that the warrant application failed to mention that the police had met with an informant "a mere eight days" before they applied for a wiretap which would have indicated that the investigation was in its "infancy" at the time of the application and that normal investigative techniques had not been tried.  Id. at 121.  The court found that the failure to reveal the actual onset of the investigation was a material omission undermining the finding of necessity.  Id. at 122.  See also Candella, 171 A.D.2d at 332-33 (finding warrant application failed to demonstrate necessity for wiretap where investigation was only two months old, police efforts to use an available informant were minimal, and defendant had neither acted in an evasive manner nor refused to deal with informant).

If SA Canavan had made clear in his affidavit that Mr. Baez had been signed up as a CS only fourteen days earlier, the New York court could not reasonably have found that normal investigative procedures had been tried and failed.  Including this material fact would have demonstrated that the DEA had failed to take advantage of a profitable avenue of investigation and would have undermined the necessity for the wiretap.

B.    The Fruits Of The Federal Title III Wiretap Orders Should Be
      Suppressed Because The Affidavit By SA Drouin Contained
      Material False Statements And Omitted Material Information
      Which, If Corrected Or Included in the Affidavit, Would Have
      Barred a Finding of Necessity.

The information and evidence derived from the Federal wiretap also should be

suppressed because the affidavit filed by SA Drouin in support of authorization to intercept the

wire communications to and from Mr. Cartagena's cellular telephone was not a "full and

complete statement" as required by 18 U.S.C. § 2518(1)(c).  Although SA Drouin swore that

normal investigative procedures had been tried and failed or appeared unlikely to succeed in the

future, the Drouin Affidavit omitted critical information which indicated that normal

investigative techniques had not failed, but to the contrary already had resulted in information

valuable to the investigation.  This omitted information was material and, if included in the

Affidavit, would have barred a finding of necessity.

In his affidavit, SA Drouin created the impression that, as a cooperating source, Mr. Baez

had been able to recover only the most general information regarding Lopez and his drug

enterprise.  Drouin Aff. ¶ 26-27.  While noting that the confidential sources of information,

including Mr. Baez, had provided valuable information, SA Drouin claimed that, "The value of

these sources of information is, however, limited."  Id. ¶ 68.  In addition, SA Drouin averred that,

"DEA does not have access to have type (sic) of cooperating individual would be able to

infiltrate the organization."  Id. ¶ 68.  Contrary to SA Drouin's assertion, however, the DEA did

have access to the type of cooperating individual who would be able to infiltrate the organization

and provide agents with information that would accomplish the goals of the investigation.  Under

the CSA, Mr. Baez was authorized to infiltrate a drug organization, pose as a person engaged in

the illicit sale or distribution of controlled substances, and wear a recording or transmitting device in furtherance of these activities. CSA at 1; Tr. at 53. He was, therefore, in a position to provide the DEA with the information it sought without resorting to an intrusive wiretap. This array of activities permitted to Mr. Baez, however, receives no mention in SA Drouin's Affidavit.

The DEA-6s and the testimony of SA Canavan indicate that at the time of the application for the Title III interception order, Mr. Baez had significant, frequent contact with Lopez and, as a result, had already begun to infiltrate the organization. At one point, Mr. Baez had been traveling with Lopez for several weeks and had met his east coast heroin distributors. He had spoken with Lopez almost every day. Furthermore, DEA knew that Lopez "spoke freely of his drug enterprise" with Mr. Baez. DEA-6 at 1 (6/16/05). Mr. Baez had met with Lopez' workers and associates in the narcotics business and had obtained information about Lopez' methods to receive heroin. Canavan Aff. ¶ 20. Mr. Baez' contact with Lopez yielded significant details regarding a heroin shipment going to New York. DEA-6 at 1 (6/16/05). Mr. Lopez trusted Mr. Baez sufficiently to have him transfer funds to and from members of the organization responsible for transporting and extracting the heroin from furniture. Surveillance Report at 1; Expenditure Report at 1; Tr. at 15-16, 55. Mr. Baez was also able to provide DEA with the list of furniture to be transported. DEA-6 at 1 (6/29/05). These facts are either excluded from the Drouin Affidavit or are referred to in only the most general way.

SA Drouin also fails to mention that, at one point, Mr. Baez was able to get possession of of Lopez' phone and give DEA agents the opportunity to copy down all numbers recorded on it. Tr. at 34-35. Mr. Baez also provided the DEA with information about additional members of the organization such as "Alex" and Maritza Palaez-Jimenez whose voice he had identified from a

recorded telephone conversation in the custody of the DEA.  SA Drouin fails to mention that, as a result of information provided by Mr. Baez, DEA agents were able to conduct surveillance of additional members of the organization, take photographs, obtain physical descriptions, and obtain license and registration information for vehicles.

Mr. Baez had already made significant progress in infiltrating Lopez' organization and was likely to continue to do so in the future.  In his Affidavit, however, SA Drouin minimized the extent of the activities Mr. Baez was authorized to perform under the CSA, minimized the nature and frequency of contact between Mr. Baez and Lopez, and minimized the efforts of Mr. Baez to that date and the quality of the information he had provided.   In general, SA Drouin glossed over the degree to which Mr. Baez had already infiltrated the organization and underestimated his ability to continue to do so in the future.  For example, to bolster the claim of necessity, SA Drouin stated that "surveillance is an investigative technique that is limited" and cannot be conducted of meetings that occur inside buildings.  Drouin Aff. ¶ 72.  However, the CSA allowed Mr. Baez to wear a recording or transmitting device which would have enabled him to provide critical information from indoor meetings.  In fact, Mr. Baez had already successfully recorded a meeting with Lopez, and he had not indicated any unwillingness to do so in the future.  He had also allowed DEA agents to install audio, video and GPS surveillance equipment in his vehicle in order to further assist the investigation.

Had the omitted facts been included in the Drouin Affidavit, the Court would have been unable to conclude that the federal wiretap was necessary.  Where the government misleads the issuing judge about the willingness of a particular informant to testify and about his ability to uncover evidence of a conspiracy using only conventional techniques, suppression of the information derived from the wiretap is warranted.  United States v. Ippolito, 774 F.2d at 1485.

Not only were the omissions material to a finding of probable cause, but the omissions were made either knowingly or intentionally or with reckless disregard for the truth. SA Drouin knew the extent to which Mr. Baez had assisted the DEA in gathering evidence. He was aware that Mr. Baez was signed up as a confidential informant for the DEA and that he was authorized under the supervision of his agent to infiltrate the Lopez drug organization. Tr. at 108. He testified that he had seen the CSA signed between the DEA and Mr. Baez. Tr. at 109. He also had access to the same information available to SA Canavan. SA Canavan testified that contact with the Boston office probably began in June 2005. Tr. at 59. Both agents testified that they were in contact and exchanged information regarding the investigation. See Tr. at 69, 80 and 91. SA Drouin also testified that he had received information from SA Canavan. Tr. at 76. Drouin testified that he was getting the information that Mr. Baez provided from agents in New York. He also testified that he had copies of the DEA-6 reports prepared by SA Canavan and that SA Canavan had sent them in connection with SA Drouin's preparation of the Title III affidavits. Tr. at 107. Furthermore, SA Drouin had a duty to obtain and disclose to the district court any relevant information in the possession of the DEA in New York which was participating in the ongoing investigation. See United States v. Salemme, 978 F. Supp. at 348, citing United States v. Mastroianni, 749 F.2d 900, 909-10 (1st Cir. 1984) (DEA agent had duty to obtain and disclose to court any relevant information in the possession of FBI, which was participating in investigation). Although he had access to all of the information available on the scope of Mr. Baez's activities, he testified that "I utilized some of the information provided to me by Agent Canavan in the affidavit." Tr. at 77. Given the extent of the information available to him and his admission that he only used "some" of the information provided, his omission of the facts

described above can only be seen as knowing, intentional or made with reckless disregard for the truth.

      C.          <u>The Fruits of Any Subsequent Wiretaps Should Be Suppressed</u>

Any information or evidence derived from wiretaps subsequent to the Federal wiretap of September 29, 2005 should also be suppressed.  If a wiretap order is issued solely on the basis of illegally intercepted conversations from an earlier wiretap, the subsequent wiretap and its evidentiary fruits may not be admitted.  <u>United Sates v. Plotkin</u>, 550 F.2d 693, 695 (1st Cir.), <u>cert</u>. <u>denied</u>, 434 U.S. 820 (1977).  Where the affidavit supporting the wiretap contains information derived independently from the earlier illegal wiretap, the question is whether putting aside all tainted allegations, there is sufficient independent and lawful information in the affidavit to justify issuance of a wiretap order.  <u>Id</u>. at 696 (internal citations omitted); <u>see</u> <u>United States v. Spagnuolo</u>, 549 F.2d 705,712 (9th Cir. 1977) (suppression required where conversations intercepted under first wiretap formed the essence of probable cause allegations in affidavits for subsequent wiretaps; any remaining untainted allegations were of negligible significance); <u>United States v. Wac</u>, 498 F.2d 1227, 1231 (6th Cir. 1974) (suppression required where results of conversations overheard under the initial order were essential to any extension of the intercept authority; communications intercepted under the extension order were derivative evidence).  The affidavits submitted in support of the subsequent wiretaps relied heavily on information derived from the New York state and Federal wiretaps, and themselves contained further misrepresentations and material omissions.

<u>Conclusion</u>

For these reasons, Mr. Baez respectfully requests the Court to suppress the fruits of the New York state wiretap and the Title III interception orders; and to conduct a <u>Franks</u> hearing to find facts with respect to the misrepresentations and material omissions from the affidavits filed in support of the the New York state wiretap and the Title III interception orders.

PABLO BAEZ
By his attorney,

/ S /  Peter B. Krupp

Dated: August 30, 2006

Peter B. Krupp
  B.B.O. #548112
Karen E. Friedman
  B.B.O. #548943
Lurie & Krupp, LLP
One McKinley Square
Boston, MA  02109
Tel:  617-367-1970

<u>CERTIFICATE OF SERVICE</u>

I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on August 30, 2006.

/ S /  Peter B. Krupp

Peter B. Krupp