UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 05-10304-03-GAO |
| V. | ) | |
| | ) | |
| LEONEL LONDOÑO-CARDONA | ) | |

### MEMORANDUM IN SUPPORT OF MOTION TO PROHIBIT USE OF INTERCEPTED ORAL COMMUNICATIONS AND ANY EVIDENCE DERIVED THEREFROM AT TRIAL OF THIS CASE

Now comes LEONEL LONDOÑO-CARDONA, and files this Memorandum in Support of his Motion to prohibit the use of the content of intercepted oral communications and any evidence derived therefrom by the government during the presentation of its case-in-chief at trial.

This motion seeks to exclude evidence of communication interceptions by Colombian authorities provided the government (and reviewed by the United States agents and prosecutors) without approval of a United States court obtained prior to examination and use of the content of the intercept against the defendant. This prosecution against Mr. Londoño-Cardona relies not upon a search and seizure of defendant's tangible property in Columbia (in whole or in part) but on an invasion of his legitimately held expectation of privacy first accomplished within Columbia by Columbian law enforcement agents.

This motion does not involve a dispute over the provenance of this foreign seizure but instead seeks a ruling on the legal sufficiency or legal propriety of the proposed use of the fruit of this warrantless invasion of privacy at trial of this case. United States law enforcement officers have apparently reviewed the content of those interceptions and the government has made use of

them (and evidence derived from them) in initiating this prosecution all without benefit of any Court approval. Mr. Londoño-Cardona anticipates further use of this material against him at trial of this case, as the government contends the evidence is admissible as the acquisition of the oral communications was reasonable, Title III is inapplicable outside the United States and the Fourth Amendment does not apply to searches of foreign national's property outside of the country.

These contentions are wide of the mark as it is the domestic element of defendant's conduct which the Government seeks to punish in this prosecution. Moreover, it seeks to do so by using the fruits gleaned from communication intercepts which it proposes to disclose notwithstanding a variety of United States statutory prohibitions to the contrary contained in a Chapter of Title 18 replete with references to interstate or foreign commerce.[1] In fact, the offenses listed in § 2516 specifying which crimes senior Justice Department officials may

---

[1] **§ 2510(1)** (reference to interstate or foreign communications or communications affecting interstate or foreign commerce);
**§ 2510(12)** (reference to a system that affect interstate or foreign commerce);
**§ 2510(19)** (reference to foreign intelligence information);
**§ 2511(1)(b)(ii)** (reference to use of a device when copy);
**§ 2511(2)(a)(ii)** (reference to electronic surveillance as defined in section 101 of the Foreign Intelligence Surveillance Act);
**§ 2511(2)(e)** Notwithstanding any other provision of this title or section 705 or 706 of the Communications Act of 1934 it shall not be unlawful for an officer, employee, or agent of the United States in the normal course of his official duty to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, as authorized by that Act.
**§ 2511(2)(f)** Nothing contained in this chapter or chapter 121 or 206 of this title or section 705 of the Communications Act of 1934 shall be deemed to affect the acquisition by the United States Government of foreign intelligence information from international or foreign communications, or foreign intelligence activities conducted in accordance with otherwise applicable Federal law involving a foreign electronic communications system, utilizing a means other than electronic surveillance as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978 and procedures in this chapter or chapter 121 or 206 of this title and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act and the interception of domestic wire, oral, and electronic communications may be conducted.
**§ 2511 (5)(a)(I)** (reference to a private satellite video communication);
**§ 2517 (6)** (reference to disclosure of interception contents that include foreign intelligence or counterintelligence or foreign intelligence information);
**§ 2517 (7)** (United States disclosure of intercept contents to a foreign investigative or law enforcement office);
**§ 2517(8)** (United States disclosure of certain information to foreign government officials).

authorize interception for as part of the government's investigative effort are, in the main, statutes easily capable of employment to reach extraterritorial conduct.[2]

**1.  Several statutes of the United States prohibit use of this evidence at trial of this indictment.**

Section 3504 of Title 18 of the United States Code prohibits use of the content of these interceptions and the fruit hereof at trial of this case:

> Litigation concerning sources of evidence.
> (a) *In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States--*
>
> (1) *upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;*
>
> (b) *As used in this section "unlawful act" means any act [involving] the use of any electronic, mechanical, or other device as defined in section 2510(5) of this title) . . .* ***in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto.***[3]

Regardless of where on the globe the actual interceptions occurred disclosure of the content of the intercepted oral communications at public trial of this case would violate of the provisions of Chapter 119 of the United States Code (18 U.S.C. § 2510 et seq.). Such disclosure would also be

---

[2] See Pasquantino v. United States, 544 U.S. 349, 370 (2005). Unlike the statute involved in Small v. United States, 544 U.S. 385 (2005) (18 U.S.C. § 922(g)(1)); Title III is surely not a statute in which Congress has only "domestic concerns in mind." Pasquantino, at 370 (construing 18 U.S.C. § 1343).

[3] **§ 2510 (5)** "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than--
(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business; or (ii) being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties. . .

contrary to 18 U.S.C. § 2517(3) which allows divulgement of the contents of wire, oral or electronic communications *(or evidence derived therefrom)* while giving testimony under oath in court proceedings, only if certain statutory preconditions[4] are satisfied:

> (3) *Any person who has received,* **by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter** *may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof* (emphasis supplied).

Whatever else may be said regarding the legal sufficiency of the methods used to acquire the contents[5] of the oral communications here in issue by the Colombian National Police, it is clear that they were not intercepted in accordance with the provisions of Title III. It is no answer that Title III is inapplicable to actions by a foreign sovereign in its own territory in enforcing its own laws. American law enforcement officers were present and cooperated in the intercept effort. They seek to use the fruit of this intercept in a United States criminal prosecution. The venue of the proceeding and the identity of the sovereign prosecuting the infraction determines the applicability of the Constitution and statutes of the United States to a proceeding not the status of an accused. See Balzac v. Puerto Rico, 258 U.S. 298, 309 (1922; see also Best v. United States,

---

[4]United States v. Southard, 700 F.2d 1, 31 (1st Cir. 1983) (in discussing the provisions of § 2517(5), indicated that its purpose was to assure Congress that the government did not secure a wiretap authorization to investigate one offence as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization order are lacking. [The same might be said of the government decision to forego seeking judicial approval for the fruit of the Colombian intercepts it intended to use in this prosecution)].

[5] According to **§ 2510(8)**, "contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication.

184 F.2d 131, 138.[6]

## 2. Compliance with Colombian law by Colombian authorities does not excuse but rather highlights the failure of United States agents and prosecutors to satisfy a basic precondition for use of this evidence at trial of this case - compliance with the Constitution and laws of the United States.

That the intercepted communications were captured by Columbian law enforcement officers acting according to laws and procedures in force in their country at that time does not save the situation for at least two (2) reasons:

1. Columbian law allowed interception of communications in the authority of a Columbian prosecutor,[7] while United States law makes clear that securing a warrant from a detached judicial officer is, "absent truly exigent circumstances, an important element of reasonableness and the provisions of Title III - and their constitutionality - rely in meaningful measure on an independent judicial officer deciding what is reasonable, necessary and appropriate . . ." United States v. Ferrara, 771 F. Supp. 1266, 1308 (D. Mass. 1991) (discussing particularity requirement of § 2518).[8]

2. While an intercepted conversation must be captured when made, nothing in this case *(except the unbridled curiosity of the recipients)* precluded Columbian authorities from

---

[6]The statement in United States v. Cotroni, 527 F.2d 708, 711 (2d Cir. 1990) that the location of the interception determines the applicability of Title III to the contrary notwithstanding, the site of the proceeding where the intercept traffic will be publicly unveiled determines the nature and extent of the protection accorde any accused.

[7] There was no Mutual Legal Assistance Treaty (MLAT) in force between Colombia and the United States during the relevant time period. Columbia and the United States are two (2) of the 170 signatory states to the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances of 1988. Article 7 of the Convention (Mutual Legal Assistance) makes no mention of interception of electronic, wire or oral communication but does contemplate that signatories may enter into bilateral or multilateral Mutual Legal Assistance Treaties. The United States and Columbia have not done so. Text of Convention at http://www.unodc.org/pdf/convention_1988_en.pdf; Status of Treaty Adherence at http://www.unodc.org/unodc/en/treaty_adherence.html ; and Status of MLATS and other Agreements at http://travel.state.gov/law/info/judicial/judicial_690.html. (visited 24 August 2007). The United States and Colombia are also signatories to the Inter American Conventions on Mutual Assistance (with an optional protocol) in Criminal Matters. See http://www.oas.org/juridico/english/treaties/a-59.html. (visited September 12, 2007).

[8]Ferrara also notes that the Supreme Court's increasing willingness to dispense with the warrant and probable cause requirements of the Fourth Amendment has been accompanied by a corollary requirement of the utilization of judicial warrant while encouraging flexibility in their content when conventional terms could not feasibly be employed. Id. at 1291.

sealing the intercepts before delivery to the DEA and subsequently to United States prosecutors for the purpose of allowing those investigative and law enforcement officers to obtain judicial approval to unseal and utilize the intercepted material in United States prosecutions. This certainly could have been seamlessly implemented had the DEA requested this procedure be followed at the inception of this operation.[9]

The Affidavit of DEA Special Agent Jean Drouin of September 29, 2005 filed in the District of Massachusetts in support of an application to intercept communications occurring over telephone number 617-642-3867 (the CARTAGENA TARGET TELEPHONE) targeting Julio Cartagena, Luis Lopez, Alberto M. Benval and Merup Reman Ramerez - Baez disclosed the following information relating to the interceptions by Columbian police:

29. Furthermore, DEA agents in New York were aware that LOPEZ was using this second telephone number, (347) 968-7593, based upon an ongoing investigation being conducted by the Columbian National Police in Columbia, South America. In particular, LOPEZ was intercepted pursuant to a wiretap being conducted by the Columbian National Police which is legally authorized pursuant to Columbian law. During these intercepted calls which took place on June 24, 2005 and June 30, 2005, LOPEZ was using (347) 968-7593 to speak with a male in Columbia. During the conversation, LOPEZ and the Columbian male talked about the pending delivery of furniture to the United States.

Another affidavit of Special Agent Drouin of October 20, 2005 submitted in support of an application to intercept communications occurring over telephone 617-230-5434 (the LOPEZ TARGET TELEPHONE) targeting Julio Cartagena, Luis A. Lopez and Judy LNU disclosed further information about the content of communications intercepted in Columbia stating:

Seizure of Approximately 16 kilograms of Heroin on October 8, 2005 in Cartagena, Columbia.

---

[9] United States v. Grubbs, 547 U.S. 90, 94-95 (2006) (The anticipatory nature of warrants is clear in the context of electronic surveillance); United States v. Kamen, 2006 U.S. Dist. LEXIS 41148; United States v. Zayas-Diaz, 95 F .3d 105, 110-111 (1st Cir. 1996); and United States v. Ricciardelli, 998 F .2d 8, 12 (1st Cir. 1993) discuss "anticipatory search warrants" approvingly. United States v. Southard, 700 F.2d at 27 (in discussing § 2518(1): The basic question is whether there is probable cause for issuing the warrant, not whether the criminal conduct is past, present or future).

39. As further described in my September 29, 2005 affidavit, there is an ongoing investigation being conducted by the Columbian National Police (CNP) with the assistance of the DEA in Bogota into a heroin trafficking organization that is believed to be associated with LUIS LOPEZ. According to information provided to the DEA from the CNP about this investigation, the organization transports large quantities of heroin hidden in furniture from Colombia to the United States.

40. (Redacted)

41. On October 8, 2005, members of the CNP Anti-Narcotics Unit (CNP-ANTIN) inspected a shipment of household (redacted).

42. The investigation in Colombia is ongoing. According to continuing intercepted conversations being conducted by the CNP which are authorized pursuant to Colombian law, the 16 kilograms seized on October 8, 2005 were part of a larger shipment of heroin that had already been sent out. Recent intercepted calls indicate that another shipment of heroin departed Colombia on October 18, 2005.

In fact, the references to "authorizations pursuant to Colombian law" made by Special Agent Drouin in his affidavit serve more to establish that Colombia considers the interception of communications an invasion of privacy requiring implementation of special procedures and the obtaining of approval prior to allowance of the actual intercepting. Whether protected by the Fourth Amendment or not, the interceptions are certainly "searches." United States v. Jacobsen, 466 U.S. 109 (1984) (a search occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed"); Berger v. New York, 388 U.S. 41, 51 (1967) (the interception of an oral discussion is a search and seizure).

So long as the fruit of the Colombian interception is used in a Colombian prosecution (or not utilized in a United States one) the comparative differences in the levels of protection afforded those intercepted in either country are of no moment. Only when the Colombian intercept is proposed for use in a United States prosecution do the differences become important. Among those differences, the requirements of authorization by a politically responsible Justice

Department official at the level specified within § 2516(1) and prior judicial approval before use of the fruit of the intercept are the most central. Katz v. United States, 389 U.S. 347, 355-56 (1967) (warrantless interception of communications invalidated because accomplished without a warrant in circumstances where a judicial order[10] could have accommodated the legitimate needs of law enforcement by authorizing the carefully limited use of electronic surveillance).

The language of 18 U.S.C. § 2518(10)(a) specifies the forums where aggrieved persons[11] are entitled to move to suppress or exclude evidence under Chapter 119 and also provides the statutory grounds to do so. In sum, it provides the remedy for the right created by §2515,[12] stating in relevant part:

> *(10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that- the communication was unlawfully intercepted. . .(i) If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. . . .*

---

[10] See also United States v. Karo, 468 U.S. 703, 717 (1984) (holding that a warrant is required to monitor a beeper located in a private residence in New Mexico, and that "The government contention that warrantless beeper searches should be deemed reasonable is based upon its deprecation of the benefits and exaggeration of the difficulties associated with procurement of a warrant").

[11] § 2510 (11) "aggrieved person" means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed.

[12] § 2515: **Prohibition and use as evidence of intercepted wire or oral communications.**
Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter. United States v. Mora, 821 F .2d 860, 865-66 (1st Cir. 1987); United States v. Giordano, 416 U.S. 505, 527 (1974).

United States v. Giordano, 416 U.S. 505, 527 (1974)[13] held that the words "unlawfully intercepted" were not limited to constitutional violations and that the intent was to require suppression where there was a failure to satisfy any of the statutory requirements which directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations "clearly calling for the employment of this extraordinary investigative device." Id.  United States v. Ferrara interpreted this to require suppression of evidence of or relating to intercepted communications without regard to the government's good faith, if certain statutory provisions of Title III not rooted in the requirements of the Fourth Amendment were not satisfied.  771 F. Supp. at 1299; see also United States v. Chavez, 416 U.S. 562 (1974) (suppression not required because misidentification of authorized official did not play a central or even a functional role in guarding against unwarranted use of wiretapping or electronic surveillance); United States v. Donovan, 429 U.S. 413, 437 (1977) (to same effect regarding naming all those government has cause to believe be intercepted).  The provisions of § 2518(10)(c)[14] make clear that Fourth Amendment jurisprudence is to be used in analyzing electronic surveillance violations of a constitutional magnitude but not those involving central provisions of Title III which are controlled by the provisions of the statute.  Ferrara, 771 F.Supp.

---

[13] Giordano concluded that in § 2516(1) Congress made preliminary approval of submission of wiretap applications a central safeguard in preventing abuse of electronic surveillance as an investigative and prosecutorial tool.

[14] **§ 2518(10)(c)** provides:
(c) The remedies and sanctions described in this chapter 18 U.S.C.S. §§ 2510 et seq. with respect to the interception of electronic communications are the only judicial remedies and sanctions for non-constitutional violations of this chapter 18 U.S.C.S. §§ 2510 et seq. involving such communications.

at 1304.  Section 2515 was construed as a provision central to the legislative scheme[15] enacted as Title III.  18 U.S.C. § 3504 was also construed by <u>Gelbard v. United States</u>, 408 U.S. 41 (1972) to be an "explicit confirmation that Congress intended that grand jury witness in reliance upon the prohibition of § 2515 might refuse to answer questions based on the illegal interception of their communications"  see <u>id.</u> at 52.

In <u>United States v. Marcus</u>, 491 F .2d 901, 903 (1st Cir. 1974) the First Circuit respectfully recognized Title III's legislative history tying § 2515 and § 2518(10) together.  That case construed the statutorily stated grounds for suppression contained within § 2518(10) to include:

(i)     All common law or constitutional objections to electronic surveillance as a form of search and seizure except statutory ones arising under § 2518(10);

(ii)    Violations of these statutory procedures particularized in § 2518(10)(ii) and (iii).[16]

Here, both grounds dictate denying the government use of the fruits of the wiretap in Columbia at trial of this indictment.

<u>United States v. Blue</u>, 384 U.S. 251, 255 (1966) - while setting forth the "general common law practice" of admitting probative evidence at trial despite its illegal origin - also

---

[15] <u>Gelbard</u> provides:
Its (§ 2515) importance as a protection for "the victim of an unlawful invasion of privacy" could not be more clear. The purposes of § 2515 and Title III as a whole would be subverted were the plain command of § 2515 ignored when the victim of an illegal interception is called as a witness before a grand jury and asked questions based upon that interception. Moreover, § 2515 serves not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also "to protect the integrity of court and administrative proceedings." Consequently, to order a grand jury witness, on pain of imprisonment, to disclose evidence that § 2515 bars in unequivocal terms is both to thwart the congressional objective of protecting individual privacy by excluding such evidence and to entangle the courts in the illegal acts of Government agents. <u>Id</u>. at 50-51.

[16] Other violations subject an offender to different sanctions [see § 2511(1) (criminal penalties); § 2520 (civil damages)].

recognized that in a number of areas the Court has countenanced or developed exclusionary rules where evidence has been gained in violation of an accused's rights under the Constitution, federal statutes, or federal rules of procedure. One authority relied on by Blue was Nardone v. United States, 308 U.S. 338, 342 (1939), a case involving warrantless interception of private conversations which excluded direct and indirect evidence obtained by employment of methods specifically prohibited by a statute. United States v. Verdugo-Urguidez, 494 U.S. 259, 264 (1990)[17] in holding the Fourth Amendment inapplicable to physical seizures of tangible property of non-resident aliens and located in a foreign country also noted that the provisions of the Fifth Amendment operate in a different manner than those of the Fourth Amendment. The privilege against self incrimination *(and the right to due process of law)* guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants [italicized material added; not in original]. See Malloy v. Hogan, 378 U.S. 1 (1964). Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial. Kastigar v. United States, 406 U.S. 441, 453 (1972).

3.  **Circuit law provides that evidence of the content of these interceptions is inadmissible at trial of this case during the United States' case-in-chief.**

United States v. Vest, 813 F.2d 477 (1st Cir. 1987)[18] affirmed the suppression of evidence

---

[17]The United States relies heavily on Verdugo-Urguidez as well as United States v. Bravo, 480 F .3d 88, 94-95 (1st Cir. 2007) to escape compliance with the provisions of Title III in its handling of this electronic surveillance conducted by the Colombian National Police whose fruits were examined without court order by DEA. A decision that the Fourth Amendment does not apply to physical searches and seizures of property of non-resident aliens and located in a foreign country does not aid the Government's case at the pretrial phase of this litigation.

[18]The same result was reached in Benanti v. United States, 255 U.S. 96 (1957) a decision under the Federal Telecommunications Act excluding evidence of interception of wire communications by state law enforcement officers acting under a state court warrant because the content of the surveillance was disclosed to the jury in violation of 47 U.S.C. § 605. Benanti is interesting as it followed the teaching of the Nardone decision that evidence violative of § 605 is inadmissible in a federal court. This is so even though the evidence was admissible on authority of Schwartz v. Texas, 344 U.S. 199 (1952) in a **state** criminal prosecution despite the plain prohibition of § 605.

pursuant to 18 U.S.C. § 2515 by the district court in the trial context reiterating that the protection of privacy was an overriding Congressional concern in exacting Title III.  The Court emphasized § 2515's importance and vitality as a protection for the victim of an unlawful invasion of privacy given the recurring nature of this type of intrusion which continues beyond the actual interception occurs but is compounded by disclosure in court or elsewhere.  Id. at 481 (citing cases).  Vest also recognized that the impact of the subsequent invasion of privacy (at trial or elsewhere) is not diminished by the circumstance that the disclosing party (here the government) is merely the innocent recipient of a communication illegally intercepted by another.  This is the case regardless of whether the interceptor is an illegal private party or unauthorized agents of the government.  See id. (citing United States v. Giordano, 416 U.S. at 528;[19] see also Silverthorne Lumber Company v. United States, 251 U.S. 385, 392 (1920) (The essence of a provision forbidding the acquisition of evidence in a certain way is not merely that evidence so acquired shall not be used before the Court but that it shall not be used at all).

    Vest considered and found that the result it reached (and the reasons in support thereof) were consonant with Fourth Amendment jurisprudence given Congress' dominant concern in enacting § 2515 (privacy protection) viewed in light of the purpose of the exclusionary rule - deterrence of unreasonable searches and seizures in violation of the Fourth Amendment.  Id. at

---

The rationale was that due regard for federal - state relations precluded ascribing to Congress an intent to thwart a state rule of evidence absent clear indication that Congress intended to do so.  The statement in Rea v. United States, 350 U.S. 214, 217 (1956) was recounted approvingly *("The command of the federal rules is in no way affected by anything that happens in state court they are designed as standards for federal agents.  The fact that their violation may be condoned by state practice has no relevancy to our problem")*.  This same principle is applicable here.  The actions of the Colombian National Police pursuant to their law do not give the United States law enforcement agents carte blanche to bypass the strictures of Title III.

[19] Recognition of this prompted the Court to decline to read into § 2515 an exception permitting the introduction in evidence (at trial) of an illegally intercepted communication by an innocent recipient thereof. See Vest at 481.

483. So here suppression of the communications intercepted in Columbia and the fruit derived therefrom at trial of this case is faithful to the command of Congress and accommodates the teaching of Verdugo-Urguidez. It is also consistent with United States v. Toscanino, 500 F .2d 267, 279-80 (2d Cir. 1974) which applied the protections of 18 U.S.C. § 3504 to an alien defendant's request for an affidavit affirming or denying the occurrence of an unlawful act in the form of eavesdropping by agents of the Government against the defendant in Uruguay. What was said in Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144, 152-53 (D.D.C. 1976) has resonance in this case:[20]

> *Where the res at issue is within a domestic court's jurisdiction, or when a non-resident alien makes application for relief under a United States statute which permits granting the requested relief to non-resident aliens, or when a non-resident alien is brought from abroad to appear for and be the subject of a domestic criminal prosecution, there are different expectations of treatment than when a non-resident alien is simply affected by United States officials abroad. In the former instances, the United States has the power to, or has in fact imposed the framework of its government process on the non-resident alien. The United States is the only entity with power over the res, it is the entity requiring an applicant to follow a prescribed statutory process, or it is the entity attempting to render justice regarding the non-resident alien in a domestic court. In each of these cases, the non-resident alien should be entitled to the advantages of the legal process with which he is forced to deal.* (emphasis added).

Here both the res and the defendant are before the Court and the relief requested is contained in a statute of the United States applicable to all accused.

Gelbard v. United States, 408 U.S. 41 (1972) analyzed a grand jury witness' attempt to interpose the provision of 18 U.S.C. § 2515 as a defense to a civil contempt charge arising from a

---

[20]This analysis was given in the process of dismissing a foreign national plaintiff from a case alleging warrantless electronic surveillance in Germany by United States Army personnel. Unlike Mr. Londoño-Cardona, that individual had no contact with the United States other than as one of the plaintiffs in that civil case against "myriad Department of Defense Army officials." The alleged surveillance occurred during the Nixon era.

refusal to answer questions derived from information gleaned from illegal wiretapping. Although Title III authorizes invasions of individual privacy under certain circumstances, "the protection of privacy was an overriding congressional concern" of total legislation.  Id. at 48 (footnote omitted).

Gelbard was unequivocal in rejecting attempts to equate the consequences of searches involving documents or tangible objects with the harm inflicted by electronic interception of private conversations:

> *Contrary to the Government's assertion that the invasion of privacy is over and done with. . .(when the communication is intercepted). . .to compel the testimony of these witnesses compounds the statutorily proscribed invasion of their privacy by adding to the injury of the interception, the insult of compelled disclosure.  Of course, Title III makes illegal not only unauthorized interceptions, but also the disclosure and use of information obtained through such interceptions 18 U.S.C. § 2511(1).  See 18 U.S.C. § 2520.  408 U.S. at 51-52.*

To the same effect is Gouled v. United States 255 U.S. 298, 306 (1921) which, in discussing the intersection of the protections of the Fourth and Fifth Amendments to the Constitution at trial of a criminal case, noted that in practice the result is the same to an accused whether he be obliged to supply evidence against himself or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers.  "In either case he is the unwilling source of the evidence and the Fifth Amendment forbids that he shall be compelled to be a witness against himself in a criminal case."  By the expedient of "partnering" with the Colombian police, the prosecution seeks there to avoid the prohibitions of § 3504, § 2515 and § 2518 and to resuscitate the "silver platter doctrine" interred in Elkins v. United States, 364 U.S. 206 (1960); Benanti v. United States, 355 U.S. 96 (U.S. 1957).  This should not be permitted.

The constraints of the Due Process Clause protecting defendants against government overreaching by entrapping into illegal conduct those not predisposed to criminality or by coercing confessions from those suspected of criminal activity are well known. See Hampton v. United States, 425 U.S. 484, 488-91 (1976); and Arizona v. Fulminante, 499 U.S. 279, 286-88 (1991). The government's attempted use of evidence from the defendant's own mouth obtained by surreptitious electronic breaching of a legitimate expectation of privacy is a tactic cut from the same bolt of cloth. It should be similarly rebuffed.

In United States v. Patane, 542 U.S. 630, 637-38 (2004) a plurality of the Supreme Court noted that the core protection offered by the self incrimination clause is the prohibition against compelling a criminal defendant to testify against himself at trial. The Fifth Amendment is not concerned with non-testimonial evidence and denies the prosecution use of compelled testimony during presentation of its case-in-chief by virtue of the exclusionary rule contained within the text of the Amendment.[21] Surely that prohibition reaches these conversations obtained surreptitiously by breaching defendant's reasonable expectation of privacy all without benefit of the Order of a United States judicial officer countenancing use of this device in this prosecution. See also United States v. Balsys, 524 U.S. 666, 674 (1998) (protection of the Fifth Amendment limited to prosecutions by a sovereign that is itself bound by the Clause - here the United States).

4. **Title III is an investigative tool - as flexible wide ranging and available for use as is the violation of United States law being investigated or prosecuted.**

In other aspects, the teaching of United States v. Toscanino, 500 F.2d 267, 279-80 (2d

---

[21]This view of "testimonial evidence" is consistent with that stated in Davis v. Washington, 126 S. Ct. 2266 (U.S. 2006) a Sixth Amendment Confrontation clause case. (Statements are testimonial when their circumstances objectively indicate no ongoing emergency and that the primary purpose of the statement relates to past events potentially relevant to later criminal prosecution).

Cir. 1974) (a case involving interception of wire communications in Uruguay) on the extraterritoriality of Title III is not as straightforward as suggested by the Government:[22]

> *The term "wire communications" as used in the statute. . .is intended to refer to communications "through our Nation's communications network" (internal citation omitted; emphasis original). In prescribing the procedures to be followed in obtaining a wiretap authorization, see 18 U.S.C. § 2518, the statute significantly makes no provision for obtaining authorization for a wiretap in a foreign country.*

Toscanino can fairly be characterized as the seminal decision that Title III has no extraterritorial application. Both that case and Cotroni which followed it closely in time focused on the fact that "wire communications" were intercepted out of the Eastern District of New York and in fact in foreign nations. This focus upon court authority over the phone provider located where the interception occurs in lieu of evaluating the permissibility of allowing government prosecutions to replicate an invasion of privacy accomplished without prior approval of a United States judicial officer by permitting introduction of the intercept into evidence in a United States

---

[22]Because the language of Chapter 119 is precisely defined and because the terms "wiretap" or "eavesdrop" appear nowhere within Title III but are liberally used in Court decisions about Title III, stating some of the Title III definitions here may be useful:

A. **§ 2510(1)** *"wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce;*

B. **§ 2510 (2)** *"oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication;*

C. **§ 2510 (4)** *"intercept" means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.*

D. **§ 2510 (12)** *"electronic communication" means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include-- (A) any wire or oral communication. . .*

prosecution produces an incorrect result. It also abdicates a responsibility ceded to the United States judiciary by the Congress *(determining the admissibility of the content of intercepted oral communications at trial)* to a foreign judicial officer, or worse, in the case of the surveillance in this case, on the determination of a foreign prosecutor (encouraged or assisted by United States investigative or law enforcement officers).

It is also readily apparent that the phrase "oral communication" is much broader than "wire communication" (itself a subcategory of "oral communication"). The different categories are a necessary demarcation because interception of wire or electronic communications requires that the government "partner" in the endeavor with a provider whereas interception of an "oral communication" does not.[23] Section 2518(3)'s limitations on the territorial effectiveness of Title III orders is therefore more of a procedural barrier related to the organization of the United States District Court system or to principles of abstention because of comity among nations than a substantive restriction on the power of United States Courts' authority over government efforts to use the product of warrantless surveillance of oral communications in prosecutions in United States courts.[24] The fact that the United States court system imposes practical limits on the ability of its district judges to enter orders outside of the district in which located or the fact that orders of the courts of any country have no effect extraterritorially (absent a treaty embracing the topic

---

[23] See related article on NSA's domestic eavesdropping program: "Role of Telecom Firms in Wiretaps is Confirmed" August 24, 2007 New York Times at http://www.nytimes.com. Notes also that the section establishing the procedure for the interception of all categories of communications, § 2518, sets out different requirements depending on whether the government is seeking to intercept oral communications or wire (or electronic) communications. The unitary guidance of § 2518(1)(a) - (f) then diverges depending on whether the application to intercept concerns wire or oral communications.

[24] The Antelope, 23 U.S. 66, 122-23 (1825) ("The Courts of no country execute the penal laws of another").

of the order) cannot be translated into a license to bypass the prohibition against the use of intercept evidence obtained or examined without prior judicial approval in criminal prosecutions initiated and held in the United States. Best, 184 F.2d at 138.

As Pasquantino v. United States, 544 U.S. 349, 362 (2005) makes clear criminal prosecutions are brought by the United States in its sovereign capacity to punish domestic criminal conduct. There is no doubt that Congress has the authority to enforce its laws beyond the territorial boundaries of the United States. United States v. Yousef, 327 F .3d 56, 86 (2d Cir. 2003); United States v. Nippon Paper Industries Co. Ltd., 109 F.3d 1, 3 (1st Cir. 1997). In point of fact a wide range of United States criminal statutes have extraterritorial application.[25] To posit that Congress - while internationalizing the reach of United States criminal statutes continues to confine the use of the extraordinary investigative device of surreptitious interception of communications to criminal activity committed within the confines of the Continental United States - is, in a word, counterintuitive. The Congressional purpose in enacting Title III was clearly stated in Giordano.

> *The words "unlawfully intercepted" are themselves not limited to constitutional violations. . . Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device. . .intended not only to limit resort to wiretapping to certain crimes and situations where probable cause is present but also to condition the use of intercept procedures upon the judgment of a senior official in the Department of Justice that the situation is one of those warranting their use. It is reasonable to believe that such a precondition would inevitably foreclose resort to wiretapping in various situations where investigative personnel would otherwise seek intercept authority from the court and the court would very likely authorize its use.*

---

[25] See CRS Report for Congress: Extraterritorial Application of American Criminal Law (updated August 11, 2006) available at http://fpc.state.gov/documents/organization/22168.pdf.

> *We are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored.* Giordano *at 527-528.* See also United States v. Lopez*, 300 F .3d 46, 51-52 (1st Cir. 2002).*

This present prosecution, like that in Pasquantino creates little risk of causing international friction through judicial evaluation of the policies of foreign sovereigns. Here the United States Attorney for Massachusetts acts in the interest of the United States (subject to the oversight of the Executive of his conduct). In this manner any foreign relations interests of the government may be fully accommodated as this matter progresses.

## CONCLUSION

What is really at issue here is the domestic interest of the Executive in attempting to use warrantless interception of conversations at trial of this case. The failure of the government to obtain prior Justice Department and prior judicial approval warrants suppression of this evidence during presentation of the United States case-in-chief.

    Respectfully submitted,
    **LEONEL LONDOÑO-CARDONA**,
    By his attorney,

    /s/ George F. Gormley
    _____

    George F. Gormley (BBO# 204140)
    *George F. Gormley, P.C.*
    755 East Broadway
    South Boston, MA 02127
    (617) 268-2999

Date: September 17, 2007