UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )   Criminal Action
v.                            )   No. 05-10304-GAO
                              )
JULIO CARTAGENA,              )
                              )
        Defendant.            )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**DISPOSITION**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, August 7, 2008
2:55 p.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Neil J. Gallagher, Jr., Assistant U.S. Attorney
 3         John Joseph Moakley Federal Courthouse
           Suite 9200
 4         Boston, Massachusetts 02210
           On Behalf of the Government
 5
           ROSE, CHINTZ & ROSE
 6         By: Alan D. Rose, Sr., Esq.
           29 Commonwealth Avenue
 7         Boston, Massachusetts 02116
           On Behalf of the Defendant
 8

 9    In Attendance:    Maryanne Leavitt, U.S. Probation Office

10                      Deborah Huacuja, Certified Spanish
                        Court Interpreter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               P R O C E E D I N G S

2        THE CLERK:  All rise.  The United States

3  District Court for the District of Massachusetts.  Court

4  is now in session.

5        Please be seated.

6        For a sentence in the case of United States of

7  America versus Jose Mejia, which is Docket 05-10304.

8        Would counsel please identify yourselves for the

9  record.

10        MR. GALLAGHER:  Good afternoon, your Honor.

11  Neil Gallagher for the United States.

12        MR. ROSE:  Good afternoon, your Honor.  Alan

13  Rose for the defendant, Jose Mejia, who also, of course,

14  in these proceedings has been identified and originally

15  charged and arrested as Julio Cartagena.

16        THE CLERK:  Madam interpreter, would you please

17  raise your right hand.

18        (The interpreter is sworn.)

19        THE CLERK:  Please state your name and spell

20  your last name for the record.

21        THE INTERPRETER:  For the record, my name is

22  Deborah Huacuja, H-U-A-C-U-J-A.  And, your Honor, the

23  defendant has asked me to be on standby; that he

24  understands pretty well.

25        THE COURT:  All right.

1          Well, Mr. Mejia has previously pled guilty to
2    one count of conspiracy to distribute heroin, one count
3    of maintaining a place for the purposes of drug
4    distribution and one count of money laundering, and now
5    appears for sentencing on his conviction of those counts
6    upon his plea of guilty.
7          I have a final presentence report that's been
8    submitted by the probation office.  And I guess my first
9    question, since a place to start in considering an
10   appropriate sentence is what advice the guidelines would
11   give as to the appropriate sentencing range, is are
12   there issues as to the guideline range that we need to
13   address and resolve?
14         MR. GALLAGHER:  Well, initially, your Honor, I
15   think there are some agreements.  There's agreement
16   amongst the parties but a disagreement between the
17   defendant and what probation's come down to in the PSR.
18         First, with regard to drug weight:  The
19   government has agreed, and I do think it's really
20   appropriate, and the defendant makes a good point, that
21   the range that probation came at was between 10 and 30
22   kilograms of heroin.
23         The agreement the government made at the plea
24   colloquy is that the government would take the position
25   that should be between three and ten, a total of 34.

PDF created with pdfFactory trial version www.pdffactory.com

1    And the difference, as reflected in the PSR, between --

2    is just over ten kilograms, taking into account all the

3    cocaine and all the marijuana.  So the difference

4    between a Level 34 and a Level 36 is really based upon a

5    not-so-great amount of heroin including amounts that

6    were not seized.  There was not more than ten kilograms

7    of heroine seized, but cocaine.  There were wiretap

8    conversations which corroborated that, but they were

9    wiretap conversations; they were not seizures of heroin.

10        So I would urge the Court to find between three

11   and ten, a Level 34.  I think that's borne out.  There's

12   only a slight difference between that and what the PSR

13   has found for drug weight.

14        And so perhaps I should go one issue at a time.

15   There are a few issues on guidelines.

16        MR. ROSE:  Well, your Honor, I agree with

17   what -- I think that what Mr. Gallagher has said.  The

18   dispute is not really between the government and the

19   defense with regard to the range of the drug quantity

20   we're talking about.  We've agreed for these purposes

21   that there is evidence tying my client to transactions

22   having a weight of somewhere between three kilos and ten

23   kilos.  That's obviously a large range.

24        My position -- our position is that the weight

25   is actually much closer to three kilos; in fact, I

1    itemized the transactions in my sentencing memo.  And

2    the calculation we come up with is just over three

3    kilos, 3,065 grams.  And there's actually some

4    double-counting as to those because there's both receipt

5    by Mr. Mejia and then the further distribution of some

6    of those items.

7           The Court doesn't need to resolve that issue

8    because, again, we've agreed with the government that,

9    for the purposes of this sentencing proceeding, the drug

10   quantity should be deemed to be between three kilos and

11   ten kilos and not what the presentence report has come

12   up with.

13          Your Honor, I would also point out that Mr.

14   Mejia did not plead to any particular weight of drugs

15   when he tendered his conditional plea back on January

16   11th, or thereabouts, of this year.  The Court

17   specifically pointed that out.  And so it was up to the

18   parties to develop whatever arguments they planned to

19   make.  The plea agreement, however, in the case was that

20   the government would advocate for between three and ten,

21   and based upon my examination of the record and the fact

22   that I don't believe there should be an evidentiary

23   hearing at which we might try to prove that the amount

24   is actually below three and the government might offer

25   evidence that might show that it's closer to ten.  I

PDF created with pdfFactory trial version www.pdffactory.com

1    don't know.

2          But I don't believe there's an adequate --

3    certainly there's no adequate evidentiary basis for the

4    Court to go over ten kilos, and we've agreed that there

5    need not be evidence either.

6          THE COURT:  Well, it's all well and good, but

7    maybe I'm misunderstanding something.  As I read the

8    PSR, the calculation proposed there does not depend on

9    the drugs but on the money-laundering counts.  Am I

10   right about that?

11         MS. LEAVITT:  That's correct; however, the

12   money-laundering statute refers you to the drug amount

13   and then just adds two levels based on the drug amount.

14         MR. ROSE:  The PSR advocates, I believe, for --

15         THE COURT:  Let me just follow up on that.  I

16   see.  So that the 34 would be 36, or the 36 would be 38,

17   is what you're saying?  I see.  Okay.  Never mind.  So

18   it's entirely derivative?

19         MS. LEAVITT:  Correct.

20         MR. ROSE:  That's the dispute.  Of course when

21   you get up to those levels, it's highly material, you

22   know, just ignoring other factors.

23         THE COURT:  Okay.  Well, I'll accept the

24   parties' view.  I mean, I think it's at least debatable

25   whether -- the probation officer's recommendation --

PDF created with pdfFactory trial version www.pdffactory.com

1    suggestion that it's over ten kilos.  It's not over by

2    much, on their own calculation, and I think it's

3    sufficiently debatable that accepting the parties' range

4    of three to ten is a satisfactory resolution of the

5    issue.

6              MR. ROSE:  I just wanted to point out, your

7    Honor, that there is a typographical error.  I believe

8    we can all agree that it's a typographical error on page

9    62 of the revised PSR.  And I raise it because this, of

10   course, is a docket which follows the defendant

11   throughout the process.  But page 62, the base offense

12   level, refers to the equivalent of 10,000 to 30,000

13   kilograms, which I think was intended to say "grams,"

14   not "kilograms."

15             THE COURT:  No.  No.  That's the marijuana

16   conversion.

17             MS. LEAVITT:  That's the marijuana conversion.

18             THE COURT:  Because there's two drugs involved,

19   they get converted into marijuana units.  And that would

20   be correct in marijuana units.

21             MR. ROSE:  All right.  Well --

22             THE COURT:  It comes to the same band.  You're

23   talking about the same -- well, you're talking about a

24   different band.  But here it would be -- I think it

25   would be 3,000 to 10,000 kilograms of marijuana, which

PDF created with pdfFactory trial version www.pdffactory.com

1    would be --

2             MS. LEAVITT:  That's correct.

3             THE COURT:  -- at Level 34.

4             And, actually, if you look at 2D1.1(c)(3), and

5    go down about six from the end of that list, you'll find

6    the 3,000 kilograms, the 10,000 kilograms of marijuana.

7             MR. ROSE:  I see.  All right.  But in any event,

8    the Court is accepting the parties' view, not

9    probation's view, as to the drug quantity?

10            THE COURT:  Which has the effect, at Paragraph

11   205, of reducing the number from 36 to 34.

12            MR. ROSE:  Correct.

13            THE COURT:  Okay.  Let's just work through,

14   then, the 206 -- since one of the counts is on this 18

15   U.S. Code 1956, there's an additional two?  I think

16   that's probably uncontroversial?

17            MR. ROSE:  We agree as to that, your Honor.

18            THE COURT:  Then at Paragraph 2 of 7 the

19   probation office suggests an adjustment in the role in

20   the offense of four levels.  Is there an issue with

21   respect to that?

22            MR. ROSE:  Yes, there is an issue, your Honor.

23            THE COURT:  Okay.

24            MR. GALLAGHER:  And it's our position, and our

25   agreement in the plea, that the Court should award

PDF created with pdfFactory trial version www.pdffactory.com

1   three.  And, again, it's sort of -- this is a sort of

2   similarly difficult situation where the guideline does

3   not define what organizer, leader or supervisor or

4   manager is.  And in this case clearly Mr. Cartagena --

5   Mr. Mejia was managing a large-scale drug organization.

6   He had runners -- four different runners -- who were

7   delivering drugs; he had a stash house; he had a

8   somewhat sophisticated money-laundering operation.  But

9   this was a quite an extensive heroin importation

10  conspiracy as well.

11        This Luis Lopez, who had a direct connection to

12  Colombia and some very high-level traffickers in the

13  area of Pereira, Colombia, and was importing large

14  quantities of heroin, the person he gave that heroin to

15  was Julio Cartagena.  But Julio Cartagena got the heroin

16  from Luis Lopez.  So he was not, I would say, at the top

17  of the pyramid even though he did have a lot of

18  management supervision.  And, you know, assuming the

19  fact that it involved -- he recruited accomplices, he

20  definitely recruited people into the conspiracy, not

21  only accomplices in terms of runners, but customers.

22        So I do think three is appropriate.  That's what

23  we agreed to.  And I would urge the Court to, instead of

24  four, award three, which would result in Level 39 for

25  his acceptance of responsibility.

1          MR. ROSE:  And, your Honor, we disagree both as

2    to the PSR's suggestion of four levels and the

3    government's suggestion of three levels.  I believe that

4    both suggestions are simply out of line with what Mr.

5    Mejia actually did.  I mean, while the evidence in the

6    case is clearly extensive, I've listened to these tape

7    recordings, your Honor, and a lot of the talk is just

8    that; in other words, it's talk.  There aren't that many

9    transactions in which Mr. Cartagena -- Mr. Mejia is

10   involved.

11         As the government points out -- of course the

12   government knows the facts better than anyone, but

13   Mr. Lopez is clearly the leader on the domestic side of

14   this operation.  You know, the operation requires drugs.

15   Without the drugs, Mr. Mejia is a -- you know, he's

16   absolutely a nobody.  And he certainly does not have

17   direct contact with the people in Colombia, who were

18   described as Caliche and Iguana.

19         There are other defendants, actually.  I believe

20   Mr. Serna actually had direct contact with -- I believe

21   it was Iguana.  But there's no evidence -- I'll

22   represent to the Court that there was no contact between

23   Mr. Mejia and the people in Colombia.  So, again, you've

24   got the people in Colombia who were at the top, you've

25   got Mr. Lopez who's in New York who's the recipient of

1    the drugs, and then you've got Mr. Cartagena/Mejia who's

2    in Massachusetts.

3           Does he have a few people who are working with

4    him?  Yes.  I don't believe the number is five.  And

5    it's interesting to note, your Honor, that the

6    presentence report refers not to the number of people

7    who are involved in drug activity -- and I'm not going

8    to try to fasten -- to justify fastening Mr. Mejia with

9    four levels, but they suggest that there were six people

10   involved in the money-laundering operation through

11   Triteza Communications.

12          Well, of those six people, I think it's

13   important to point out, your Honor, the government

14   charged only two people with the money-laundering

15   conspiracy.  So on the government's view of the

16   evidence, there were two people -- there's a third

17   person whose name is redacted; I don't know who it is.

18   So on the government's view of the evidence, there are

19   no more than three people who were involved in the

20   money-laundering conspiracy.  So that can't justify

21   either a four-level raise or a three-level raise under

22   the way that the role in the offense guideline works.

23          And so, your Honor, I would submit that on the

24   evidence what would be justified is a raise in the

25   offense level of not more than two.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          THE COURT:  Okay.  Well, I think the government
 2    has the better of the argument.  It's not required for
 3    this particular guideline that the particular defendant
 4    at issue be supervising five people, the activity has to
 5    involve five or more participants.  Application Note 2
 6    says, "To qualify for an adjustment under this section,
 7    the defendant must have been the organizer, leader,
 8    manager or supervisor of one or more other
 9    participants."
10          Now, that refers to all categories, I guess.
11    But I don't understand that the -- you have to drown the
12    organizational chart such that you can find direct
13    supervision of each of the participants that exceeds
14    five.
15          MR. ROSE:  Could I just respond briefly, your
16    Honor?  We've looked carefully at what the First Circuit
17    has done with similar cases.  And we've listed those
18    cases on pages 10 and 11 of my sentencing memorandum.
19    If you look at the May case, Ventura, the Pierre case,
20    the Patrick case, those are four cases we found where
21    the First Circuit found justified the addition of four
22    levels.  They just do -- those cases all involve a level
23    of activity by the defendant far greater than what you
24    have here in terms of the degree of control and
25    authority exercised over others.  Recruiting people,
```

1    collecting proceeds, controlling the flow of drugs,

2    being at the center of everything was something which

3    the First Circuit, you know, said in the *Pierre* case; or

4    in the *Patrick* case they pointed to the fact the

5    defendant had ultimate decision-making authority,

6    determined who could sell on his group's property,

7    decided when to act against rival drug dealers,

8    recruited accomplices -- and recruited accomplices, some

9    of whom were juveniles.

10        Just looking at the facts of those cases where

11   the First Circuit has said a four-level addition was

12   justified, they just don't seem to fit here, and nor, I

13   suggest, looking at the same -- looking at the same

14   factors, would three levels be justified either.

15        MR. GALLAGHER:  Judge, if I could just speak

16   briefly, just so that it's clear, I mean, that's just

17   not the facts of this case.  The defendant supervised,

18   recruited, hired and paid at least four different

19   runners in this case starting with Vinicio Mejia, which

20   is -- and this is all stuff -- Vinicio Mejia -- who had

21   seized 130 grams of heroin.  That's how they got to

22   Julio Cartagena in the first place.  He was then bailed

23   out by the defendant, Julio Cartagena, for $50,000; was

24   the same person who made deposits for Triteza

25   Communications.

PDF created with pdfFactory trial version www.pdffactory.com

1        After Vinicio Mejia, Alberto Benval was the

2    person that was at the stash house.  And the person he

3    took orders from was Julio Cartagena.  Julio Cartagena

4    was on the phone just about every day giving orders

5    about ordering mixtures of heroin and heroin cut.  The

6    only person who was giving any direction was Julio

7    Cartagena -- Jose Mejia.  Leslihe Abad and Tirso

8    Ciriaco, with Mr. Perez, the other two runners, their

9    whole job was to deliver heroin, pick up money.  And the

10   person they took the orders from was Julio Cartagena.

11       There's just -- that's just not the facts of the

12   case.  And there's at least four people in this case --

13   he's not required to directly supervise -- that he

14   recruited and hired who would not otherwise be

15   participants in this conspiracy without the actions of

16   this defendant.

17       THE COURT:  Yeah.  I think the facts of the case

18   support that, generally.  Another point that was made --

19   I think it was a little bit -- not germane -- and that

20   is, I don't think the guideline requires that a

21   particular defendant be at the very top of what might be

22   an extended organization.  And so the fact that there

23   might be people even above someone does not necessarily

24   stand in the way of an adjustment of either three or,

25   perhaps, even four.

1          And I think it's -- you know, by -- if you want

2     to consider the enterprise to have stretched from

3     Colombia to Malden or East Boston or whatever, clearly

4     the local original sales office for Mr. Cartagena, or

5     Mr. Mejia, and the people like Ciriaco and Rivera and

6     many others, as well as the ones that Mr. Gallagher has

7     mentioned, were working directly under his supervision.

8          So I think a three-level adjustment is amply

9     justified.  I mean, I think a case can be made for the

10    four, but I'm just not going to go as far as the

11    government wants to go.  And so I think a three-level

12    adjustment is appropriate.

13         That would lead to a -- from 34 plus two for the

14    1956 adjustment plus three would now be 39.  There's

15    three levels down for acceptance of responsibility.  I

16    think it brings it to rest at 36, unless there are any

17    other issues with respect to the --

18         MR. ROSE:  And we had filed a motion for

19    deviation from --

20         THE COURT:  Right.  I just want to settle the

21    guidelines first and then I'll hear from you as to what

22    might be an appropriate sentence.  Category I:  So at 36

23    the guidelines advice would be 188 to 235 months.

24         Now, having settled that as one of the factors

25    in the statute, I'll invite you to address the other

PDF created with pdfFactory trial version www.pdffactory.com

1    factors and make a particular recommendation as to the

2    sentence.

3          MR. GALLAGHER:  Your Honor, the agreement the

4    government made with the defendant is to argue the low

5    end of the guidelines in this case, 180 months, and

6    that's what we're going to ask for, and that is

7    justified in this case.  It's a substantial sentence.

8    It's a 15-year sentence for a man who's about 42 years

9    old and is facing deportation upon conviction.

10          But this -- the defendant really was at the

11   center of really a self-contained heroin conspiracy that

12   was really, on a day-to-day basis, moving large

13   quantities of heroin in the North Shore of

14   Massachusetts, in an area particularly hard hit by

15   heroin and more pernicious drugs that have really

16   affected the Commonwealth in the past couple of years.

17          What's also uncommon is the defendant, he really

18   had a direct pipeline to Colombia that was moving

19   kilograms of heroin really from Colombia to Florida to

20   New York right to Massachusetts over the same period of

21   time.  The defendant had the ability to recruit other

22   persons, sell heroin to a cadre of other heroin dealers

23   who were selling heroin across the North Shore

24   themselves, and then had his own money-laundering

25   operation that he had pled guilty to in which he used

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   his own business in order to launder drug funds to the
 2   Dominican Republic and Colombia.
 3        So a 15-year sentence for not only the amount of
 4   people involved, the amount of participants involved as
 5   far as the drug couriers, the drug dealers, the methods
 6   they used to launder the money, and just the extent of
 7   the enterprise to Colombia, this pipeline of heroin, the
 8   quantity coming to the defendant who pushed it out on
 9   the streets, justifies a sentence of 15 years.
10        And, your Honor, I notice there's some factors
11   that Mr. Rose had cited, but I really do think that
12   because of the nature of this offense and the effect
13   this had on the Commonwealth, that those factors are
14   really cancelled out by the seriousness of this offense
15   and a 15-year sentence, 180 months, is appropriate.
16        MR. ROSE:  Well, your Honor, first of all, I
17   don't want anything I say to be construed as minimizing
18   the charges here or the nature of the conduct.  And,
19   frankly, I also want to compliment Ms. Leavitt for the
20   extraordinary job she did in putting together the
21   presentence reports not just for this case but, you
22   know, in all of these cases.
23        Your Honor, I once was before Judge Skinner
24   whose portrait is, I notice, behind me.  And I heard him
25   say that nothing is more difficult than sentencing
```

1    because no matter what the judge does, you can always

2    find another defendant who did more by way of criminal

3    activity and got a shorter sentence.  And the converse

4    is also true:  You can also find another defendant who

5    did less and gets a greater sentence.

6            I'm not advocating anything that is out of line

7    with what the Court has done in other sentences in this

8    case, nor anything which would be disproportion.  And I

9    know that the Court has a difficult job here.

10           The defendant is accompanied here by members of

11   his family, including a young girl named Dana who the

12   defendant refers to as a stepchild; and she regards Mr.

13   Cartagena as virtually a father figure in his life.  He

14   does have three children.  He has a close relationship

15   with his children.  And as the Court is aware,

16   especially post *Gall* and post *Kimbrough*, in this

17   post-*Booker* world that we now have, the Court is

18   entitled to take into consideration the nature and the

19   characteristics and background of the defendant.

20           I would point out there are letters from family

21   members including from children.  He does have a close

22   relationship with his children; he loves them very much.

23   He wants to try to maintain those relationships to the

24   extent possible.  And I'd ask that the Court be lenient

25   in making a sentence in view of that factor.

PDF created with pdfFactory trial version www.pdffactory.com

1          I would also ask that to the extent possible,

2    that the Court recommend to the Bureau of Prisons that

3    the defendant be sentenced to a federal prison which is

4    in New England, or certainly not further away than New

5    York, so that his children and their mothers will have

6    the chance to visit him while he is in -- while he is in

7    prison.

8          The Court also has the revised presentence

9    report which contains important information developed

10   from Mr. Mejia's sister which corroborates the

11   statements that were made which are reflected in the

12   report filed with the Court by Dr. Daignault.  In short,

13   your Honor, Mr. Mejia had a very, very troubled

14   relationship.  His father was physically and

15   psychologically abusive.  Mr. Mejia essentially was

16   forced to stop school when he was in the ninth grade; he

17   went off and worked in a grocery store for several

18   years.  He then worked on a farm.  He was required first

19   to give all of his money to the family and then some of

20   the money to the family.  Dr. Daignault reports that

21   because of the way in which Mr. Mejia was raised, he

22   suffers from various disorders, and Dr. Daignault

23   believes that those disorders certainly preceded the

24   criminal conduct for which Mr. Mejia has been convicted.

25          I would also point out, your Honor, that Mr.

PDF created with pdfFactory trial version www.pdffactory.com

1  Mejia does have skills and abilities.  He started

2  Triteza Communications, I believe, in 2002 or 2003.  He

3  worked hard at that business.  Unfortunately, he let it

4  get involved in unlawful activity.  But he does want to

5  get out of prison as soon as he can so that he could

6  continue to try to apply his skills and abilities to

7  lawful activity.

8          Right from the start of this case, your Honor,

9  Mr. Mejia told me that he did want to cooperate with the

10  government.  The nature of the cooperation he wanted to

11  provide, however, was not the kind of cooperation that

12  was -- I should say it this way:  The fact that he was

13  in prison made the nature of the cooperation that he

14  wanted to provide simply not practicable.  But he did

15  want to cooperate, you know, but that simply did not

16  work out.

17          And also, your Honor, Dr. Daignault's report

18  reflects that Mr. Mejia has had trouble with substance

19  abuse in the past and that he has never had any kind of

20  treatment.  And I would ask that to the extent that the

21  Court believes it is able to recommend treatment

22  programs in prison, that would be, I believe,

23  appropriate as well.

24          Your Honor, I would also point out the

25  government has -- as the government has pointed out,

PDF created with pdfFactory trial version www.pdffactory.com

1    that the defendant will be deported as soon as he has

2    finished serving his sentence.  And I believe all of

3    these factors are factors which now the Court is

4    entitled to take into circumstances in the

5    post-*Kimbrough* regime in which we now operate.

6           Your Honor, finally, I note that Mr. Serna, who

7    actually was someone who had conversations not just with

8    Mr. Lopez but also with people in Colombia, received a

9    sentence from this Court of 70 months, and Mr. Benval

10   received a sentence of 90 months.  The sentence that I

11   am advocating, your Honor, would be at the bottom of the

12   guideline range for Offense Level 32; in other words,

13   I'm asking the Court to essentially deviate or depart

14   downward from Level 36 to Level 32, the guideline range

15   for which would be 121 to 151 months.

16          And I'd point out that a sentence of 121 months

17   would be 31 more months than Benval received.  Benval,

18   again, was sentenced to 90 months.  And a sentence of

19   121 months would be 51 months more than the sentence

20   imposed on Mr. Serna, who got 70 months.  So in other

21   words, your Honor, a sentence of 121 months would be

22   proportionately greater than other codefendants, which I

23   believe makes some sense, but not -- it wouldn't be so

24   outsized, which I believe 188 months would be outsized,

25   which would be, I think, highly disproportionate to the

PDF created with pdfFactory trial version www.pdffactory.com

1    sentences of the other defendants.  So that's why I seek

2    the sentence of 121 months.

3              THE COURT:  Mr. Mejia --

4              MR. ROSE:  I believe that my client may -- I'm

5    not sure, but my client may wish to say something.  It's

6    up to you.

7              THE COURT:  Let me just make sure.  Mr. Mejia,

8    you have the opportunity now to say something if you

9    wish.  You don't have to if you don't want to, but it's

10   your chance if you wish.

11             MR. ROSE:  My client said that he's nervous,

12   he's just not sure --

13             THE DEFENDANT:  I'm way, way too nervous, but I

14   just would like to -- I know you have a very difficult

15   decision to make today.  And that I just wish -- I would

16   like to apologize, you know, for what I've done.  I

17   cannot -- I mean, what I done is wrong.  I want to

18   apologize to the government, to the Court, to the law

19   officers.  And I also want to apologize to my family

20   members, which I know I caused a lot of pain.

21             I got four kids, three of my own and a

22   stepdaughter which I love very much.  They are Dana,

23   she's 24; Emilio, 20; Jessica, 15; the little one is 12

24   years old.  I want to say I'm sorry to all of them.  And

25   we have a good relationship.  And I would like to keep

1    that when I get out of here.  I also would like -- I

2    can't -- this is too much.

3         I would just like to apologize to the Court, if

4    you know what I mean.  I got a lot of respect for the

5    job Ms. Leavitt do here, but I do disagree with the

6    conclusions she make about my degree and deportment.

7    And I just like to ask you to be lenient.

8         Thank you and God bless you all.

9         (Pause.)

10        THE COURT:  Among the factors to be addressed in

11   an appropriate sentence is the nature and seriousness of

12   the offense.  And this, of course, as I think the

13   government has argued, is a very serious offense.  The

14   poison of heroin is a very corrupting and corrosive

15   agent in communities, and particularly, in communities

16   who are struggling in other ways.  And so it's a very

17   serious offense that needs a serious response, and so

18   the penalty that is imposed must do both justice to the

19   offense and promote respect for the law so that kind of

20   criminal behavior is suppressed.  By the same token, the

21   sentence should be not only disabling to a particular

22   defendant from further criminal behavior but also an

23   advice and warning to others who might undertake it,

24   that there will be serious consequences if they're

25   apprehended and convicted.

PDF created with pdfFactory trial version www.pdffactory.com

1          The sentence must take account of the particular

2     circumstances of the individual defendant, and in

3     particular, the criminal and social history and

4     guidelines essentially factor much of these things in.

5     There is a ten-year, or 120-month, minimum mandatory,

6     sentence that is applicable here.  The -- all the

7     factors in the sentencing statute are modified, in a

8     sense, by the introductory language to the statute which

9     says that whatever penalty is imposed must be sufficient

10    but not greater than necessary to achieve the

11    objectives.

12         One of the objectives of the guidelines is to

13    produce a scale of judgment that can be used in

14    cross-cases in an effort to be sure that there's not

15    unwarranted disparity among like cases.  I think it's

16    also appropriate now, under *Booker*, although it may not

17    have been the case law when the guidelines were

18    mandatory, to have regard to the scale of penalties

19    within the context of particular criminal activity and

20    in the context of a particular case.

21         With all of that in mind, I think that a

22    sentence that is sufficient but not greater than

23    necessary is one that's a little bit below the guideline

24    range, as has been recommended here, but also above the

25    statutory minimum, and that is a sentence of 150 months,

1    which is essentially a 12-1/2-year sentence.  And I'm

2    influenced, in part, by the inevitability of deportation

3    at the end of the sentence.  I recognize that

4    incarceration is important, but I'm not sure that the

5    full guideline range is necessary, under the

6    circumstances, particularly where deportation is likely

7    to occur at the end.

8            Mr. Mejia, if you would stand, please.

9            (The defendant complies.)

10           THE COURT:  Upon your conviction of these

11   offenses and pursuant to the Sentencing Reform Act of

12   1984, it is the judgment of the Court that you be and

13   you hereby are committed to the custody of the Bureau of

14   Prisons to be committed to a term of 150 months.  This

15   consists of equal terms on each of the counts of

16   conviction, to be served concurrently.

17           I will make a recommendation to the Bureau of

18   Prisons -- two recommendations:  one, that you be

19   considered for participation in the bureau's 500-hour

20   residential drug abuse program.  I will also recommend

21   that the bureau pay attention to your family

22   circumstances and try to make a placement that would

23   make it convenient for your family to be able to visit

24   you where you are imprisoned.

25           Upon your release from imprisonment, you shall

PDF created with pdfFactory trial version www.pdffactory.com

1    be placed on supervised release for a term of five

2    years.  This consists of terms of five years -- a term

3    of five years on Count 3 and terms of three years on

4    Counts 4 and 8, all to be served concurrently.

5         Within 72 hours of your release from the custody

6    of the Bureau of Prisons you shall report in person to

7    the district to which you've been released.  I'm not

8    going to impose a monetary fine in light of the

9    financial information in the presentence report.

10        While you're on supervised release, you shall

11   comply with all the standard conditions that pertain to

12   that status.  Those are set forth in the United States

13   Sentencing Guidelines at Section 5D1.3(c).  They're

14   incorporated now by reference and will be set forth at

15   length in the judgment.

16        In addition, you shall comply with the following

17   conditions:  You shall not commit any other federal,

18   state or local crime.  You shall not illegally possess

19   any controlled substance.  You shall refrain from the

20   unlawful use of any controlled substance and shall

21   submit to a drug test within 15 days of your release

22   from imprisonment and at least two periodic drug tests

23   thereafter, not to exceed a total of 104 tests in a

24   given year, all as may be directed by the probation

25   office.

1          You shall submit to the collection of a DNA

2    sample as directed by the probation office.  You're

3    prohibited from possessing any firearm, destructive

4    device or other dangerous weapon.  If directed to do so,

5    you're to participate in a program for substance abuse

6    counseling and/or mental health counseling as directed

7    by the probation office.  In the case of a substance

8    abuse counseling program, you may be required to submit

9    to random drug testing which shall not exceed a total of

10   104 tests in any given year.

11         With respect to any such program, whether

12   substance abuse or mental health, you may be required to

13   contribute to the cost of such program based upon your

14   ability to pay or the availability of third-party

15   payment.  You shall at all times use your true name.

16   You are prohibited from the use of any false identifying

17   information which includes, but is not limited to, any

18   aliases, false dates of birth, false places of birth,

19   false social security numbers and the like.

20         Finally, if you are ordered deported, you're to

21   leave the United States and not return without the prior

22   permission of the secretary of the Department of

23   Homeland Security.

24         There are three counts of conviction.  There's a

25   $100 assessment on each count for a total of $300, which

1  is due forthwith.

2        THE CLERK:  Jose Mejia, you have the right to

3  file a notice of appeal in this case.  If you do wish to

4  file an appeal, you must file it within ten days from

5  the date the judgment is entered.  If you cannot afford

6  an attorney to file the appeal on your behalf, you may

7  request the clerk of the court to file the appeal for

8  you and I will do so.

9        Do you understand, sir?

10       THE DEFENDANT:  Yes, I do.

11       THE COURT:  All right.  The defendant stands

12 committed --

13       MR. GALLAGHER:  Your Honor, I would just ask,

14 would the Court dismiss Count 3 of the first superseding

15 indictment against Mr. Mejia?

16       THE COURT:  Yes.

17       MR. ROSE:  Without objection.

18       THE COURT:  All right.  The defendant stands

19 committed.

20       We'll stay in session for the next matter.

21       (The proceedings adjourned at 3:35 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RMR, CRR, Official

4    Reporter of the United States District Court, do hereby

5    certify that the foregoing transcript constitutes, to

6    the best of my skill and ability, a true and accurate

7    transcription of my stenotype notes taken in the matter

8    of Criminal Action No. 05-10304-GAO, United States v.

9    Julio Cartagena.

10                        /s/ Marcia G. Patrisso
                          MARCIA G. PATRISSO, RMR, CRR
11                        Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com