UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )  Criminal Action
v.                                  )  No. 05-10304-GAO
                                    )
LEONEL LONDOÑO-CARDONA, et al,      )
                                    )
          Defendants.               )
                                    )


            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE



                          **MOTION HEARING**



                John J. Moakley United States Courthouse
                          Courtroom No. 9
                         One Courthouse Way
                    Boston, Massachusetts  02210
                     Tuesday, December 18, 2007
                            2:10 p.m.



                    Marcia G. Patrisso, RMR, CRR
                       Official Court Reporter
                   John J. Moakley U.S. Courthouse
                   One Courthouse Way, Room 3510
                    Boston, Massachusetts  02210
                          (617) 737-8728

              Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Neil J. Gallagher and David G. Tobin,
 3              Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts 02210
 5         On Behalf of the Government

 6         GEORGE F. GORMLEY, P.C.
           By: George F. Gormley, Esq.
 7         755 East Broadway - Third Floor
           South Boston, Massachusetts 02127
 8         On Behalf of the Defendant Leonel Londoño-Cardona

 9         BOURBEAU & BONILLA, LLP
           By: Victoria M. Bonilla-Argudo
10         77 Central Street - Second Floor
           Boston, Massachusetts 02109
11         On Behalf of the Defendant Jose Escipion
           Fernandez-Pino
12
           LAW OFFICE OF LOIS M. LEWIS
13         By: Lois M. Lewis, Esq.
           74 Fuller Terrace
14         West Newton, Massachusetts 02465
           On Behalf of the Defendant Richard Duran
15
           KRASNOO KLEHM LLP
16         By: James B. Krasnoo, Esq.
           23 Main Street - Suite 6
17         Andover, Massachusetts 01810
           On Behalf of the Defendant Ernesto Perez
18
           LAW OFFICE OF STEPHEN J. WEYMOUTH
19         By: Stephen J. Weymouth, Esq.
           65A Atlantic Avenue - Suite 3
20         Boston, Massachusetts 02110
           On Behalf of the Defendant Victor Vega
21
           LAW OFFICE OF JOHN P. RIORDAN
22         By: John P. Riordan, Jr.
           403 N. Montello Street
23         Brockton, Massachusetts 02401-5532
           On Behalf of the Defendant Sixto Rivera
24
      ALSO PRESENT:  Patricia Bluestein, Spanish Interpreter
25
```

```
 1              P R O C E E D I N G S
 2          THE CLERK:  All rise.
 3          The United States District Court for the
 4  District of Massachusetts.  Court is now in session.
 5          Please be seated.
 6          For a motion hearing, the case of United States
 7  of America versus Leonel Londoño-Cardona, Jose Escipion
 8  Fernandez-Pino, Richard Duran, Ernesto Perez and Victor
 9  Vega, Docket 05-10304.
10          Would counsel please identify yourselves for the
11  record.
12          MR. GALLAGHER:  Good afternoon, your Honor.
13  Neil Gallagher and David Tobin for the United States.
14          MS. BONILLA-ARGUDO:  Good afternoon, your Honor.
15  Victoria Bonilla.  I am present in court with my client,
16  Jose Fernandez-Pino, who is seated in the box.
17          MR. GORMLEY:  Good afternoon, your Honor.
18  George Gormley on behalf of Leonel Londoño-Cardona.
19  And he's the second gentleman in the box.
20          MS. LEWIS:  Lois Lewis for the defendant Richard
21  Duran.
22          MR. KRASNOO:  Good afternoon, your Honor.  James
23  Krasnoo for the defendant Ernesto Perez, whose real name
24  is Tirso Ciriaco.  He is present in the jury box, and he
25  is the gentleman who is furthest to your left in the
```

1   front row.

2          MR. WEYMOUTH:  Good afternoon, your Honor.

3   Stephen Weymouth representing Richard Vega, who's in the

4   orange suit.

5          MR. RIORDAN:  John Riordan representing Sixto

6   Rivera.  He's not here today, your Honor.

7          THE CLERK:  Madam interpreter, would you please

8   rise and raise your right hand.

9          (The interpreter is sworn.)

10         MS. BLUESTEIN:  Good afternoon, your Honor.

11         THE COURT:  Good afternoon.

12         MS. BLUESTEIN:  Patricia Bluestein,

13  B-L-U-E-S-T-E-I N, certified Spanish interpreter.

14         THE COURT:  All right.  We are hearing two

15  motions that are related to the -- I'm not sure how to

16  count them, actually.  We have motions by both

17  defendants Fernandez-Pino and Londoño-Cardona to

18  suppress or prohibit evidence from what I can summarize

19  as Colombian wiretaps, and there's also a motion for

20  discovery that was filed, I guess, by those two

21  defendants as well.  Other defendants have filed -- made

22  filings suggesting a motion to join in those motions,

23  and we may have to explore a little bit exactly what

24  that means.

25         But let me try -- before we get into legal

PDF created with pdfFactory trial version www.pdffactory.com

1   argument, let me try to understand what the practical

2   lay of the land is here.  What evidence from Colombian

3   wiretaps would the government propose to introduce at

4   trial against whom?  Just so I can understand what might

5   be the real-world subject matter of the motions.

6       MR. GALLAGHER:  I think, as a practical matter,

7   we discussed -- we agreed that the foreign defendants,

8   that being Londoño-Cardona and Fernandez-Pino, be tried

9   separately.

10      THE COURT:  Correct.

11      MR. GALLAGHER:  And then that wiretap evidence

12  will be a large portion of evidence against those two

13  defendants.  But I believe --

14      THE COURT:  Let me hear that, too.  That's down

15  the road further because we don't have a trial date set

16  for that, as we do for the others.  But I want to

17  consider in either phase of the trials, what would it

18  be?  So you'll have tapes of the defendants

19  Londoño-Cardona and Fernandez-Pino themselves talking on

20  the tapes in culpatory ways; is that the idea?

21      MR. GALLAGHER:  Yes.  Talking to -- their

22  voices, and the voices of other coconspirators, both

23  indicted and unindicted defendants, talking about the

24  crimes they committed.

25      For the upcoming trial, for January 14th, the

1    government's not going to introduce any of this evidence

2    at trial; it's going to be solely the domestic Title III

3    wiretaps signed by Judge Wolf in this case. There's not

4    going to be any foreign witnesses; it's solely going to

5    be the agents here cooperating with the --

6         THE COURT: Specifically with respect to

7    Mr. Lopez, who is the one, from reading the papers, that

8    I understand was perhaps intercepted on the Colombian

9    wiretaps as opposed to the U.S. wiretaps, against

10   Mr. Lopez will there be any use of Colombian evidence?

11        MR. GALLAGHER: No. And I could say, quite

12   honestly, because I've been discussing resolution with

13   Mr. Lopez, I don't anticipate there being a trial in

14   that case. So for that reason there's not going to be

15   any wiretap evidence against him, which would be the

16   only person.

17        THE COURT: All right. So the prospect of

18   contested evidence coming in for a jury's consideration

19   would be -- from the Colombian wiretaps would be

20   evidence in the case against Londoño-Cardona and

21   Fernandez-Pino. And that would be, to be a little glib

22   about it, what we would normally have in a wiretap

23   conspiracy, drug conspiracy case, that kind of evidence.

24        MR. GALLAGHER: Yes. Yes.

25        THE COURT: I said that I had noted from the

PDF created with pdfFactory trial version www.pdffactory.com

1   papers that Lopez was intercepted in the Colombian taps.

2   Anybody else from the -- except for Londoño-Cardona and

3   Fernandez-Pino?

4           MR. GALLAGHER:  Not in this.

5           THE COURT:  Anybody else in the case?

6           MR. GALLAGHER:  Not in this case, Judge.

7           THE COURT:  No other defendant intercepted in

8   Colombian?

9           MR. GALLAGHER:  No.  Just Lopez.

10          THE COURT:  All right.  Then I guess the motions

11  are by both defendants.  I don't know which, Ms. Bonilla

12  or Mr. Gormley, who wants to go first.

13          MS. BONILLA-ARGUDO:  Thank you, your Honor.

14          Mr. Fernandez-Pino has filed a motion to

15  suppress the wiretap evidence that has been obtained

16  against him.  The wiretap evidence was obtained in

17  Colombia.  The defendant Mr. Fernandez-Pino was not, to

18  my knowledge, in any telephone conversations within the

19  U.S. wiretaps nor has had any contact in the United

20  States.

21          The reason that the defendant seeks to suppress

22  that evidence is strictly based on case law.  There is

23  no question that the defendant agrees that the case law

24  says that Title III has no extraterritorial effect, and

25  we understand that; however, there's some exceptions to

1    that rule.

2            When you're looking at those exceptions, it

3    is -- the analysis has got to be made simply by the

4    applicable principles of constitutional law.  And in

5    this case, at least in the First Circuit, in the *United*

6    *States v. Mitro* it says that when there's foreign

7    wiretaps, there are exceptions to the wiretap to be

8    introduced here into the United States at a trial here.

9    One of those exceptions, it says:  Does it shock the

10   judicial conscience?

11           And this case is particularly important, and I

12   propose to your Honor that it does shock the judicial

13   conscience.  And in order to understand that, we need to

14   understand a little bit about the legislative history in

15   Colombia and at what point these wiretaps were in effect

16   and how the law was changing in Colombia.

17           The government has addressed a little bit of it

18   in its response to our motion to suppress.  And I'd

19   suggest to your Honor that back in the year 2000 the

20   legislature in Colombia had started to meet and change

21   the law in Colombia as in regards to intercepts --

22   interceptions.  The law in Colombia up until that time

23   simply was you go to la fiscalia, F-I-S-C-A-L-I-A -- and

24   the fiscalia is the prosecution.  And so the central

25   national police in Colombia writes up reports, they go

1    to the prosecutor, the judicial prosecutor, and he

2    issues the authorization without having to go any

3    further.

4         Well, it was found that there were several

5    impositions made on citizens and violations of law on

6    Colombian citizens.  And the legislature tries to change

7    that, and I'd suggest that the United States Government

8    also helps the Colombian government to change the

9    aspect, to require that the prosecution go to a judge,

10   not just within their own means, but go to a judge

11   within 36 hours of obtaining the information authorizing

12   the wiretaps to get judicial approval, which is a little

13   bit more similar to our system here.

14        What happens is then that law becomes effective

15   August 31st of 2004.  So then change takes place.  And

16   the law, when it changes, it tells us that it's going to

17   take effect for matters -- for criminal matters taking

18   place as of January 1, 2005.  That's a little bit more

19   complicated because then they say -- there's several

20   judicial -- or judiciary districts in Colombia, and the

21   law's going to take effect into those districts at

22   different times in the future.

23        But, number one, I would focus the Court that

24   the law takes effect as of January 1, 2005.  The

25   wiretaps that are going to be introduced or have been

PDF created with pdfFactory trial version www.pdffactory.com

1   provided by the government are -- in my possession --

2   date back to April -- March, April, May of 2005.  I'm

3   particularly interested in the summer of 2005.

4        The reason that I say that this goes to shocking

5   the judicial conscience is because it's difficult to

6   believe that the Colombian National Police who has also

7   offices and works in conjunction with the DEA in Bogotá

8   is not aware that this change has occurred in the law.

9   Because the law directly affects them, they have to be

10  aware.

11        In this particular case the wiretaps, the

12  intercepts -- I'll just refer to them as "intercepts,"

13  your Honor -- these intercepts are obtained under the

14  old or the original law, where they did not need to go

15  and require a judge to approve this wiretap; simply by

16  the prosecutor authorizing it, it was enough.  And I

17  think it does shock the judicial conscience when you

18  have the government of the United States working with

19  the Colombian government, the Colombian government has

20  got to be aware that the law is changing, and they don't

21  go and seek a judge's approval to obtain the wiretap;

22  they just stay within the old law.  And that's the first

23  part of shocking the judicial conscience, your Honor.

24        The second exception is the search is a joint

25  venture.  In this case the defense does not need to

PDF created with pdfFactory trial version www.pdffactory.com

1    prove that there's a joint venture because the United

2    States Government concedes that there was a joint

3    venture.   The DEA in Bogotá was working hand in hand

4    with the Colombian National Police, and when you have

5    the United States Government working with the foreign

6    government, then we need to look to the laws of that

7    foreign government, in this case, Colombia, and we need

8    to determine if those laws were followed and if they

9    were reasonable.

10         I'd suggest to your Honor that these intercepts

11   in Colombia do have a procedure which they need to

12   follow, and the Colombian National Police writes these

13   reports pursuant to the penal process code 319.  It is

14   the law 600 of 2000.  According to these reports, there

15   are several things that the Colombian National Police

16   needs to meet under Chapter 319 -- or Article 319.  One

17   of them is simply that the individual, or the author of

18   the report, must sign the report.  The reports that I

19   have are not signed.  The other item is that these

20   reports, according to Article 319, must contain an

21   identification number for the individual who writes the

22   report identifying that individual as a member of the

23   judicial police or -- giving him some authority.

24         I do have an example.  It's Bates-stamped 703

25   and it goes to Bates 705.  And it's similar to the

PDF created with pdfFactory trial version www.pdffactory.com

1   reports that I have that I've provided.

2        The reason that this is important, your Honor,

3   is because these reports then go to the fiscalia, the

4   prosecution, and they're the basis for the issuance of

5   these intercepts.  And in a nutshell, that's sort of my

6   knowledge of Colombian law as I've been able to look at

7   it.  So I'd suggest that under the joint venture we do

8   meet the requirement, they did not follow their own

9   rules, and, therefore, we do not find them to be

10  reasonable.

11       The other argument that I raise to the motion

12  itself is that -- it's a due-process-type argument.  I'm

13  not here arguing Fourth Amendment rights; I'm arguing

14  due process on behalf of Mr. Fernandez-Pino.  And if we

15  look under 18 U.S.C. 2510(1) it specifically -- it

16  includes foreign communication.  It does not exclude

17  foreign communications; it includes them.  And that

18  would be the argument -- I'm not going to repeat it.

19  It's all right at page 12 of my memorandum.

20       Also, under 18 U.S.C. Section 2515, I propose,

21  and I suggest to your Honor, that that is truly an

22  evidentiary rule of law.  And when you look at 2515, it

23  does not say that it only -- you know, that it's written

24  pursuant to Title III; it doesn't say that it only

25  applies to Title III.  In 2515, it specifically says,

PDF created with pdfFactory trial version www.pdffactory.com

1   "Whenever any wire or oral communication has been

2   intercepted, no part of the contents of such

3   communication and no evidence provided therefrom may be

4   received in evidence in any trial, hearing or other

5   proceeding," and it goes on to end, "unless it complies

6   with the provisions."

7           Your Honor, this is an evidentiary rule.  It's

8   one thing to go outside of the United States, listen in

9   and say we're doing it pursuant to the foreign country's

10  law, and it's a very separate thing to then bring that

11  into evidence at a trial or at a hearing here in the

12  United States.  And I think that that's why 2553 reminds

13  us, and I think 2515 is a rule of evidence, as to

14  whether the information comes in or not.

15          THE COURT:  The section says that it's to be

16  excluded if it was obtained in violation of the act,

17  right?

18          MS. BONILLA-ARGUDO:  Correct.  But it's any -- I

19  focus your attention, your Honor, to the very beginning.

20          THE COURT:  Right.  You're equating "violation

21  of the act" with "obtained not in compliance with the

22  requirements of the act"?

23          MS. BONILLA-ARGUDO:  To be -- if you're seeking

24  to introduce it into evidence, correct.

25          THE COURT:  Right.  And in doing that, you're

PDF created with pdfFactory trial version www.pdffactory.com

1    sort of skipping over the question of whether the act

2    applies; in other words, your proposition is,

3    accepting -- because I think you said this -- accepting

4    that the act does not apply if the procedures aren't

5    followed, it may still be considered to have been

6    violated.

7              MS. BONILLA-ARGUDO:  If your Honor remembers, I

8    said the act has no extraterritorial effect.

9              THE COURT:  Right.  So it does not apply in

10   Colombia.

11             MS. BONILLA-ARGUDO:  It does not apply in

12   Colombia.

13             THE COURT:  And so -- but you're saying

14   nonetheless, the procedures had to be followed, and if

15   the procedures weren't followed, the act was violated

16   even though it didn't apply.

17             MS. BONILLA-ARGUDO:  That's correct.

18             THE COURT:  Okay.

19             MS. BONILLA-ARGUDO:  If you seek to introduce it

20   in a court of law here in the United States.

21             The other argument, final argument -- I raise it

22   now because the government raised it in its memorandum;

23   it's just in response.  The government says, well, even

24   if it's, you know -- if it wasn't followed, although

25   they say it was, then they always have the good-faith

1    exception.  And again, I just go back to the beginning

2    when I informed this Court when you have people who are

3    working hand in hand with a foreign jurisdiction, it's

4    difficult to say it's good faith, "We didn't know,"

5    especially when there's a change in the law, that the

6    foreign jurisdiction must have known because it applied

7    directly to that agency.

8         And it's -- I would suggest to the Court that

9    it's more simply willful blindness on the part of the

10   government, but it certainly is not good faith.  Not

11   when changes in law are taking place.  And it's the

12   prosecution, and the police in Colombia, working in

13   conjunction with our agencies here in Bogotá and in the

14   United States to obtain this evidence and later seek to

15   introduce it into the United States.  I'd say it's all

16   well and good.

17        That's what I have to say on behalf of

18   Mr. Fernandez-Pino.  Thank you.

19        THE COURT:  Thank you.

20        Mr. Gormley?

21        MR. GORMLEY:  Yes, your Honor.  I guess I would

22   begin by saying that I don't really follow my sister in

23   saying that I don't -- that Title III doesn't apply.  I

24   don't want to agree to that.  I would agree that no

25   court here in Massachusetts, or no federal court, can --

PDF created with pdfFactory trial version www.pdffactory.com

1     would or can issue an order that's going to have any

2     effect in a foreign country.  But I think Title III does

3     a lot more than that; that Title III certainly has

4     offensive views.  In other words, the government comes

5     in here to the district judges and asks for wiretaps,

6     and you and your colleagues determine to issue them.

7           And in that sense you -- I think that there are

8     certainly portions of Title III where the Court is sort

9     of tied to the telephone company or the communications

10    providers in the case where we're dealing with wire

11    intercepts or something of this nature.  And so there is

12    a certain part of Title III where it has no

13    extraterritorial effect.

14          That is not the complete statute that -- and I

15    think I recall there was a statement in one of the cases

16    that I read that said that the drafters, or the creators

17    of Title III, knew what they were doing when they put

18    this together, and that -- and I suggest that one of the

19    things that was done there was the insertion of 2515.

20          Because what we're dealing with here are

21    essentially transitory invasions of privacy which -- and

22    it doesn't really matter where the invasion took place.

23    Still, it's an invasion of privacy.  If it's done with a

24    judicial order, it's permitted.  If the privacy invasion

25    is the same, whether it's done in Colombia, done in

PDF created with pdfFactory trial version www.pdffactory.com

1  France, done here in the United States, the privacy

2  invasion is the same that -- the case of *United States*

3  *v. Vest* that suggests or says -- it doesn't suggest

4  it -- it says that an invasion of privacy occasioned by

5  an interception is kind of a gift that keeps on giving:

6  The invasion occurs when the interception or the

7  acquisition is accomplished.  And that's -- let's call

8  that Invasion 1.  There is a subsequent invasion when

9  the intercepted communications are then played in a

10 public forum, and that is Invasion 2.

11      Now, the purpose of all of the requirements of

12 2515, as the Court well knows, is to determine whether

13 or not this second invasion is permissible, that --

14 now -- and that is why, as I suggest it, the provisions

15 of Title 15 as well as the provisions of 3504 prohibit

16 any intercept -- or the use of any interceptions unless

17 the provisions of the statutes have been complied with.

18      Now, what has -- and the best case, Judge, is --

19 I think it's right on point with the exception of the

20 fact that all of the activity there -- all of the

21 activity -- occurred within the state of Massachusetts.

22 There was the interception -- the unlawful interception

23 was made by the target of the shakedown, and then when

24 it was turned over to the federal authorities -- when

25 the intercepted communication was turned over to the

PDF created with pdfFactory trial version www.pdffactory.com

1    federal authorities -- there was -- it was suppressed

2    and couldn't be used against the defendant who was

3    shaking down the victim -- or attempting to shake down

4    the victim, notwithstanding the fact that the

5    government -- the government contended that, "Well, we,

6    the United States, just came in to this tape" -- it was

7    given to them by, I think, the Suffolk District

8    Attorney's Office -- "and we had nothing to do with" --

9    "Our hands are clean.  We just received this tape."  The

10   case says:  Well, it's an interception which doesn't

11   comply with Title III.

12          Now, the fact that this took place somewhere in

13   Suffolk County -- the actual interception, the actual

14   unlawful recording -- and this recording took place in

15   Colombia, I don't really see that that's a distinction

16   that makes a difference, Judge.  There's a couple of

17   things.  And I -- as I've read the cases, the first

18   thing that is said as to -- "Well, this is okay because

19   *Verdugo-Urguidez* says that the Fourth Amendment doesn't

20   apply to noncitizens, or nonresident aliens, in

21   Colombia."

22          And I think it's best to look at this, Judge:

23   The holding of that case, that was a seizure of

24   documents or things, and I think I can say here that --

25   it's not that I agree with that case, but given the

1   holding of that case, I don't -- that has no impact

2   here, that matter.  And I suppose the way the federal

3   authorities could have partnered with their Colombian

4   cohorts, the interception could have been made, and my

5   client could have been prosecuted in Colombia and all of

6   this would have proceeded on along.  It's only -- that's

7   not what has occurred here, is that, as I understand the

8   travel of this case, the federal authorities sort of

9   were working hand in glove -- and they've admitted in

10  their papers that there was a joint venture here.

11        And what is being done is something that is --

12  well, we've been here and done that some several years

13  ago, Judge, that *Katz* has indicated -- or indicates

14  that, well, we're protecting privacy.  We're not dealing

15  with places and property concepts and things of this

16  nature; "We're protecting privacy, we just happen to be

17  using a Fourth Amendment analysis.  But we're protecting

18  people's privacy, so, therefore, all of these" -- and

19  all of these cases which have gone ahead and said,

20  "Well, we don't care what side of the wall you've got

21  the mic to listen into what's going on on the other side

22  of the wall," is there an invasion of privacy?

23        Those cases are cases which the government, as

24  the Court well knows, has contested and lost, all of

25  those silver-platter doctrine cases where the federal

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   authorities would say, "Well, we didn't do it; we were

 2   just given this illegally seized evidence by our cohorts

 3   in state government."  All of that has been contested

 4   and lost.

 5        And what you have here, Judge -- what is

 6   presented here is -- essentially it's old wine in a new

 7   bottle, Judge, that the government is telling you it's

 8   all right.  And in this case what they're saying to you

 9   is:  But this time it's different, Judge, because this

10   is imported wine; it comes from Colombia.  It's all

11   right, then, to go ahead and put it in and allow its use

12   here in a domestic case -- in a domestic prosecution.

13        The Supreme Court opinion in *Gelbard*, Judge,

14   says that one of the big concerns in enacting Title III

15   and in enacting 2510 was to ensure that the courts were

16   able to adequately preserve themselves from having to

17   deal with tainted evidence and having to go ahead and

18   have convictions rendered on tainted evidence, or

19   evidence which was obtained by using standards which

20   fell short of that which the -- in this case the

21   Congress decreed should be the statutory minimum.  That's

22   what you have here, Judge.  That's what you have here.

23        There was a simple way to correct all of this so

24   that we wouldn't be here, and it wasn't done.  And the

25   simple way is that, knowing that there was a joint
```

1  venture and that there was a partnership, if I could,

2  between the DEA and the Colombian National Police for

3  this particular operation, at least, somebody -- and

4  knowing that electronic communications were going to be

5  intercepted and that they decided to do this, somebody

6  could have come into this court and put together a

7  warrant application and just laid out the facts and

8  requested the permission of this Court as to the use of

9  this evidence, if developed, before it was obtained.

10         They didn't do that.  They didn't do that.  They

11 went ahead, they got the evidence, and now they come in

12 and they ask you to say, "Well, we" -- "Please approve

13 this, Judge.  Please do this because we acted

14 reasonably."  Well, as the Court well knows, Title III

15 requires something more than reasonableness; it requires

16 compliance with those core standards of the statute

17 that -- to obtain a wiretap.

18         And here what you have is just an abject

19 ignoring of this:  "We'll get the evidence, we'll bring

20 it in, we'll rely on the fact that we acted reasonably,

21 and we'll go ahead and proceed from there."  The

22 communications are intercepted -- or were intercepted in

23 violation, and they do not comply with the standards

24 established by Title III for admissibility here.

25         THE COURT:  Your clients are both Colombian

PDF created with pdfFactory trial version www.pdffactory.com

1    nationals?

2           MR. GORMLEY:  They are.

3           THE COURT:  They were being investigated by the

4    Colombian National Police --

5           MR. GORMLEY:  That's right.

6           THE COURT:  -- who were proceeding according to

7    whatever proceedings there were, with the cooperation of

8    American authorities.  Why at that point would the

9    American authorities have thought that the prosecution

10   of Colombian nationals by the Colombian National Police

11   required compliance with Title III?

12          It's only after the fact that there was a

13   connection made to the American branch of the

14   conspiracy, as alleged, that the prospect of an American

15   prosecution arose.  When the taps were initiated, there

16   was no -- what was the basis for the Americans thinking

17   they were going to use any?

18          MR. GORMLEY:  I don't think it was after the

19   fact, Judge.  I don't think it was after the fact

20   that --

21          THE COURT:  Well, the Salazar-Oliveros taps

22   began in April of '05; I guess the Fernandez taps began

23   in September where the investigation was, perhaps, more

24   advanced.  But particularly as to your client,

25   Londoño-Cardona, he may well find himself surprised that

PDF created with pdfFactory trial version www.pdffactory.com

1    he's here, but why wouldn't everyone else have been

2    surprised that he's here as well, at least in the spring

3    of '05?  Why wouldn't the gravity -- the center gravity

4    of the investigation -- have been in Colombia, which I

5    guess is where it was, apparently?  Why did Title III

6    occur to them any more than the domestic law of Canada,

7    for example?

8            MR. GORMLEY:  Could I just take a minute?

9            (Discussion off the record.)

10            MR. GORMLEY:  Because they were -- because the

11    DEA was providing personnel assistance.  They were --

12    the monitoring agents -- I'm sure there were Colombian

13    National Police there, but situated right beside them

14    were DEA agents, or DEA-monitoring people.

15            So, I mean, it isn't as though this was a

16    Colombian operation that was -- when completed then sort

17    of passed on to the DEA; this was something that was, as

18    the government has indicated, a joint venture and

19    that -- and that was coordinated by both agencies, if

20    you will:  The Colombian police and the DEA.  And given

21    that, and given what Title III requires, get a warrant.

22    And that somebody should have asked a judge of this

23    court or a judge of some United States court for

24    permission to do this because this is -- nobody is

25    saying that -- or the government I do not understand is

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    saying that there are exigent circumstances here.  This
 2    was all something they could have obtained a warrant.
 3           There had been, I think the extra -- the
 4    target -- I mean, it just -- the fact of Colombia
 5    sending -- or people in Colombia sending drugs into the
 6    United States, with the frequency that they do, it is --
 7    a United States prosecution was clearly in the offing at
 8    all times, Judge.  My client may just be serendipitously
 9    the victim of it, if you would, but there was -- this
10    was -- institutionally this was all set up, and they
11    certainly knew that something was going to -- that a
12    domestic prosecution was going to -- was going to result
13    here.  And they should have gotten a warrant.
14           MS. BONILLA-ARGUDO:  If I may, your Honor, just
15    to briefly add, if you look at Mr. Fernandez-Pino's
16    motion, there's two attachments.  And if you look at
17    Attachment A of Mr. Fernandez-Pino, it is an attachment
18    of the DEA in Bogotá.  And these reports, as I
19    understand them, were reports that took the place of
20    DEA-6 reports.
21           And in this it is very clear that the DEA in
22    Bogotá is acting in conjunction and coordinating these
23    events and listening in to the wires along with the CNP.
24    And when they reported back to the DEA here -- or I
25    don't know if it's working with Boston or Miami or New
```

PDF created with pdfFactory trial version www.pdffactory.com

1  York -- if you look at Part 2, it says, "On June 8,

2  2005, a judicially authorized wire intercept" -- and it

3  specifically mentions Title III -- "was obtained for the

4  following telephone numbers by the CNP."

5       Your Honor, they are aware that the law is

6  changing.  They're telling the people up here that these

7  are Title-III authorized wiretaps when they could not

8  have been because the law in Colombia does not

9  comport -- or pretend to comport with Title III

10  requirements here.  This...

11       THE COURT:  Let me hear from Mr. Gallagher.

12       MR. GALLAGHER:  Just to respond to that quickly,

13  your Honor.  The term "Title III" was more agent

14  shorthand for what they know as a wiretap; there was no

15  analysis.  This is an action pursuant to the Omnibus

16  Crime Control Act of 1968.  It was simply their

17  shorthand for talking about what a wiretap is.

18       I just want to respond to two things that were

19  raised.  About the first, Mr. Gormley's idea that a

20  Fourth Amendment violation happened not just once, but

21  twice, at the actual search in the foreign country, and

22  the introduction of that evidence, in fact, is entirely

23  contrary to what the Supreme Court said in *Verdugo* where

24  it talked about a search conducted by U.S. law

25  enforcement agents, along with the Mexican National

PDF created with pdfFactory trial version www.pdffactory.com

1    Police, at the location in Mexico.

2          And what the Supreme Court said was that "If

3    there were a constitutional violation, it occurred

4    solely in Mexico, since a Fourth Amendment violation is

5    fully accomplished at the time of an unreasonable

6    governmental intrusion."  And there's a separate

7    question about what remedies to provide once the

8    information is brought to the court.  So if a violation

9    is done, accomplished in a foreign country, not --

10   there's no separate Fourth Amendment violation, the

11   introduction of evidence in the court.

12          This really starts with the Supreme Court's case

13   in *Verdugo*, which came down in 1990, which came down

14   after the *Vest* case, the *Mitro* case that the defense has

15   cited.  And what it said was that the Fourth Amendment

16   does not apply to persons who are nonresident aliens,

17   people have no connection to the United States, which

18   there's no question in this case.  Mr. Fernandez-Pino

19   and Mr. Londoño-Cardona have absolutely no connection to

20   the United States.  They've never been to the United

21   States; they have no family in the United States.

22   There's absolutely no connection between their

23   activities other than the fact that they were sending

24   heroin to the United States.  And what the court said

25   was the Fourth Amendment does not apply.

1          Now, as I looked at this a little more, the
2     cases that came after that really confuse the
3     exceptions.  There's been a number of cases that talk
4     about exceptions to that general rule, but when the
5     exceptions come into play is when a person is a U.S.
6     citizen or nonresident alien, or has some type of casual
7     contact, that travels to the United States, a couple of
8     meetings in the United States.
9          But what the cases say, what the First Circuit
10    has said, is that even if the search conducted by U.S.
11    law enforcement -- for example, when we had a lot of
12    these maritime cases in Puerto Rico where we have U.S.
13    Coast Guard officials boarding vessels in international
14    waters, the Fourth Amendment says doesn't apply.  The
15    other cases are talking about the exceptions.
16         They talked about cases -- and they had been
17    vague about it, when a person is a U.S. citizen.  A
18    person is a U.S. citizen living in Milan, Italy, and
19    he's being investigated by the Italian police in
20    conjunction with U.S. law enforcement officials, there
21    is an exception that the courts shouldn't analyze the
22    Fourth Amendment in terms of was the foreign law applied
23    there.
24         But there are two cases I want to bring to the
25    Court's attention that sort of illustrate that ambiguity

PDF created with pdfFactory trial version www.pdffactory.com

1   the cases have brought out, the two opinions that I've
2   provided to defense counsel.  One is -- they're both
3   from the year 2007.  One is *United States v. Juan*
4   *Vincent Gomez-Castrillon*, 2007 Westlaw 2398810, District
5   of New York.  And it was the same situation where we had
6   foreign law -- it was Colombian wiretaps.
7        I was requested by the United States
8   Government -- they asked pursuant to an MLA request, a
9   Mutual Legal Assistance request, to tap that phone in
10  Colombia.  And what they said was the Fourth Amendment
11  does not apply because they're nonresident aliens.  And
12  they go on to say in that same case that even if these
13  exceptions do apply, which they don't, they would not be
14  met here.
15        Another case, and this is out of the Sixth
16  Circuit, kind of muddies it a little bit.  It talks
17  about -- it's *U.S. v. Vatani*, V-A-T-A-N-I, 2007 Westlaw
18  789038.  And it talks about the exceptions.  And it says
19  as a general rule the Fourth Amendment doesn't apply,
20  but there are two exceptions, but it's in the context of
21  U.S. citizens being investigated by foreign law
22  enforcement agents with the assistance of the U.S.
23  government.  So it's our position that the Fourth
24  Amendment does not apply at all; there are no
25  exceptions, because of *Verdugo*, the Supreme Court, and

1    the fact that these defendants are nonresident aliens.

2         In the event that when the exception does apply,

3    there are only two, and they talk about -- the

4    *Castrillon* case talks about to shock the conscience, and

5    the same situation where we had foreign wiretaps by the

6    Colombian National Police, shared with U.S. law

7    enforcement.  It was approved by a fiscalia -- a

8    prosecutor, not a judge -- and it was found not to shock

9    the conscience.  And the standard of shocking the

10   conscience, I would suggest, is not met by the fact that

11   a law enforcement agent in Colombia, following their

12   procedure, had the wiretaps approved, didn't sign his

13   name to a particular report and didn't put his ID number

14   down.

15        I would suggest that does not rise to the level

16   of shocking the conscience of the court.  And if it

17   comes down to a hearing, if the Court is not satisfied

18   that the exceptions do not apply, the government has

19   conceded for the purpose of this argument that there was

20   a joint venture for very obvious reasons:  the fact that

21   Colombia receives a large amount of U.S. support inside

22   Colombia.  Even though it's -- the Colombian National

23   Police are actually in the wire room, DEA agents are

24   sometimes present in the wire room sharing information,

25   but it's the national police who go down there, conduct

PDF created with pdfFactory trial version www.pdffactory.com

1    the wiretaps, make the arrests, do the searches.  And

2    that's done pursuant to Colombian law.  There has been a

3    change in the law, but I think, as we can see, the

4    change did not come into effect until after this case

5    was taken down; it was a prior law in which --

6         THE COURT:  I'm not sure that's the way -- what

7    I heard Ms. Bonilla say.  She argued the opposite, I

8    think.

9         MR. GALLAGHER:  There was a change in the law.

10   And what happened was, it was grandfathered-in between

11   different areas of the country.  And this investigation

12   took place in the city of Cali.  And at the time this

13   investigation was taking place, it was authorized

14   pursuant to the prior law, and the other law did not

15   come into effect until after the investigation.  And

16   that would be the testimony -- I've met with and sat

17   down with the prosecutor in Bogotá, Colombia, from the

18   maritime unit, and she explained to me how it was the

19   prior law that was applicable.

20         And the reason why it's called a "judicialized

21   wiretap" is not because it's authorized by a judge, but

22   at that time it was a different legal system.  The

23   prosecutor is actually part of the legal branch, the

24   judicial branch.  They're actually involved in

25   authorizing the seizure of property, of conducting

```
 1   trials.  And so they're judicial members.  It's
 2   different now, but back then that was the law that
 3   applied.  So that's why they're referred to as
 4   "judicialized wiretaps."
 5        THE COURT:  Well, I guess, from what you say,
 6   you would defend the actions of the Colombian National
 7   Police as lawful under Colombian law?
 8        MR. GALLAGHER:  Yes.
 9        THE COURT:  My question is:  Is it your view
10   that it matters?
11        MR. GALLAGHER:  My answer is that it does not,
12   that the case law -- even though there's some confusion
13   in other circuits, that since the exceptions -- the two
14   exceptions, the shock-the-conscience exception and the
15   joint-venture exception, do not apply because they're
16   nonresident aliens with no connection to the United
17   States, and that the search took place in Colombia and
18   was completed in Colombia.  And because they had no
19   connection to the United States, the Fourth Amendment
20   does not apply and, likewise, Title III does not apply
21   because --
22        I think it's pretty obvious it would be beyond
23   silly to suggest that a judge in this courthouse should
24   analyze the actions of a foreign government working with
25   law enforcement here in the United States -- which I
```

1    think *Verdugo* talked about plunging into a sea of

2    uncertainty, that we're trying to gauge when and if a

3    case may affect a U.S.-based prosecution and whether a

4    U.S. court could authorize conduct -- they really can't

5    in the first place.

6          But, yes, if the Court decides that an exception

7    does apply, it's our position that the wiretaps were

8    legal:  they would provide testimony of the people

9    involved in the investigation:  the DEA agent down there

10   who's working on the case received the information from

11   the Colombian National Police, the prosecutor who

12   actually authorized and installed the wiretaps.  And

13   she'll talk about how the change in the law did not come

14   into effect until after this case was investigated

15   completely.

16         THE COURT:  If a hearing of that sort were

17   necessary -- would it be necessary -- if it were

18   necessary, would it be -- would it be possible to

19   address that question:  the legality of the actions of

20   the Colombian police on the basis of affidavits?

21         MR. GALLAGHER:  Yes.  I think that's your

22   answer:  Yes.

23         THE COURT:  Okay.  Anything else?

24         MR. GALLAGHER:  No, your Honor.

25         MS. BONILLA-ARGUDO:  Your Honor, very briefly, I

1    did receive a copy from the government, and I will

2    specifically address what I have briefly read, *United*

3    *States v. Juan Vincent Gomez-Castrillon.*  It is from the

4    Southern District of New York.  I do not read it as the

5    government reads it and, in fact, what I do see is that

6    they decide in this case that their intercepts do come

7    in because the Colombian enforcement was acting as

8    agents on their own subject to the treaty -- the

9    bilateral treaty.

10         It was at the request of the United States

11   Government that they do these intercepts, but the Court

12   went on to find that the Colombian authorities conducted

13   their own investigation; the DEA had no role whatsoever

14   in monitoring the wiretaps and translating it; the DEA

15   did not have immediate access to the recording; they did

16   not provide money for the wiretaps.

17         And I'd suggest to your Honor that in our case

18   it is totally the opposite:  It is sponsored by the

19   government, monies provided.  The government has just

20   told you Colombia receives a lot of money to help

21   prosecute these cases.  This case is really not a joint

22   venture; it does not talk about them not being persons.

23         I understand the case of *Gomez-Castrillon* where

24   they relate to us that foreign nationals are not persons

25   within the meaning of the Constitution.  And honestly,

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   if our -- Judge, I am shocked at the government's
 2   comments today because what the government is saying is:
 3   We can go into another country, do whatever we want
 4   under their auspices -- so you can do torture over
 5   there, cut a few fingers and cut off a few hands -- it's
 6   okay.  We can do it here in the United States based on
 7   that argument.  But I wanted to make very clear to the
 8   Court that this case that's being cited by the
 9   government is totally inapposite to the case that you
10   have here because the connections are very, very
11   thorough.
12          The other thing in response to Mr. Gallagher:
13   The not following the procedure as to how they write up
14   the reports which they present to then obtain their
15   intercepts, that falls under when you have a joint
16   venture.  I'm not saying that that shocks the judicial
17   conscience; I'm saying that when you have a joint
18   venture, you have to look at the laws of that country
19   and you have to determine whether the country's laws
20   were followed.  And if they were not followed, were they
21   still reasonable?  There's an analysis for it.  It's not
22   simply, you know, "We accept it."  That's not the
23   analysis, your Honor.
24          So I respectfully disagree from the government's
25   point of view.
```

1          THE COURT:  Okay.

2          MR. GALLAGHER:  I realize Ms. Bonilla just got

3    this case, but if you look at the third paragraph at

4    page 3, it says, "Moreover, even if the alien with no

5    attachments to the U.S. could assert such a challenge,"

6    then it goes on to analyze.  That's the only reason I

7    brought it up, that this case clearly says that there's

8    no -- exceptions do not apply to a nonresident alien.

9          THE COURT:  All right.  I'll reserve the motions

10   with respect to the defendants Londoño-Cardona and

11   Fernandez-Pino.  To the extent that any other defendant

12   joined in those motions, they're unaffected by it.  So

13   they're either moot or denied, whichever, with respect

14   to the others.

15          Now, as long as people are here, we have a trial

16   date of January 14th, which I am regarding as a firm

17   trial date, okay?  Practically speaking, what might we

18   expect?

19          MR. GALLAGHER:  I remember last time, Judge, so

20   I think we'll be ready this time.  I anticipate a trial

21   between two and three defendants.  I have talked to,

22   actually, most counsel here about resolution of the

23   case.  And I would anticipate probably a two-week trial,

24   maybe two and a half weeks.

25          THE COURT:  Of two to three defendants?

```
 1          MR. GALLAGHER:  Yes.  If it's three defendants,
 2   probably two and a half weeks; if it's two, it could be
 3   a week and a half.
 4          THE COURT:  Okay.  And we have, I think, a
 5   pretrial scheduled already.
 6          MR. GALLAGHER:  For January 3rd.
 7          THE CLERK:  For January 4th, whatever that
 8   Thursday is.
 9          THE COURT:  Yeah.  Whatever the Thursday of the
10   first week is.
11          MR. GALLAGHER:  Yes.
12          THE COURT:  Okay.  All right.  Thank you.
13          We'll take a short recess before the next
14   matter.
15          THE CLERK:  All rise.
16          The Court will take a short recess.
17          (The proceedings adjourned at 2:58 p.m.)
18
19
20
21
22
23
24
25
```

```
 1                  C E R T I F I C A T E

 2

 3          I, Marcia G. Patrisso, RMR, CRR, Official

 4    Reporter of the United States District Court, do hereby

 5    certify that the foregoing transcript constitutes, to

 6    the best of my skill and ability, a true and accurate

 7    transcription of my stenotype notes taken in the matter

 8    of Criminal Action No. 05-10304-GAO, United States v.

 9    Leonel Londoño-Cardona, et al.

10                         /s/ Marcia G. Patrisso
                           MARCIA G. PATRISSO, RMR, CRR
11                         Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com